In re 431 W. PONCE DE LEON, LLC, Cartel Properties Spalding Woods, LLC, 525 Moreland Avenue, LLC, Cartel Properties II, LLC, Rohrig Investments, LP, and Rohrig Pollack, LLC, Debtors.

Nos. 13–53479, 13–53480, 13–53481, 13–53482, 13–53483, 13–53485.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed Aug. 11, 2014.

David L. Bury, Jr., Ward Stone, Jr., Stone & Baxter, LLP, Macon, GA, for Debtors.

David S. Weidenbaum, Office of the U.S. Trustee, Atlanta, GA, for Guy G. Gebhardt, U.S. Trustee.

***ORDER ON CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF THE DEBTORS DATED DECEMBER 18, 2013, AS AMENDED AND THE SECOND AMENDED PLAN OF LIQUIDATION FOR EACH DEBTOR PROPOSED BY RREF BB ACQUISITIONS, LLC DATED DECEMBER 31, 2013, AS AMENDED***

BARBARA ELLIS–MONRO,
Bankruptcy Judge.

This case came before the Court for a hearing (the "Hearing") [1] on March 26, 27,

1. The Court ruled on Rialto's Motion For Protective Order and preserved Debtors' rights by

28, 31, and April 24, 25, and 28, 2014, on confirmation of competing chapter 11 plans filed by 431 W. Ponce De Leon, LLC, Cartel Properties Spalding Woods, LLC, 525 Moreland Avenue, LLC, Cartel Properties II, LLC, Rohrig Investments, LP, Rohrig Pollack, LLC (collectively, the "Debtors") [Main Case, Doc. No. 266, 351, 390, 762],[2] (the "Debtors' Plan"), and by Debtors' senior secured creditor, RREF BB Acquisitions, LLC ("Rialto") [Main Case, Doc. No. 371, 389, 402, 787] (collectively, the "Rialto Plans"). At the Hearing, testimony was presented, Debtors' Exhibits 0–4, 6–25, 27–32, 34, Rialto's Exhibits 31–34, 45–51, 54 and The Knuckle Partnership and Robert C. Loudermilk (collectively, "TKP") Exhibits 1–5 were admitted, and counsel presented opening and closing arguments. After carefully considering all of the evidence presented, the arguments and briefs of the parties and the entire record of these cases, the Court now enters its findings of fact and conclusions of law as provided by Fed. R. Bankr. 7052 as applied by Fed. R. Bankr.P. 9014.

## I. BACKGROUND AND PROCEDURAL HISTORY

George Rohrig ("Rohrig") has been developing property in Atlanta for 35 years. Since at least the early 1980s, Rohrig has managed his LLCs and the properties held by the LLCs through Cartel Properties, Inc. ("Cartel Properties"). At present, Cartel Properties manages 30 to 40 LLCs for Rohrig which include the Debtors.

The management team employed by Cartel Properties has been together for a number of years, and provides leasing, accounting and maintenance services to the Debtors. Rohrig has a large number of non-debtor LLCs that include a substantial contingent of restaurant properties. Rohrig's business model relies on use of restaurant properties to create traffic in an area for retail in addition to restaurant, with the goal of redeveloping an area, one neighborhood at a time. Rohrig prefers to pursue a buy and hold strategy.

Four of the Debtors, 431 W. Ponce De Leon, LLC ("431"), Cartel Properties Spalding Woods, LLC ("CPSW"), 525 Moreland, LLC ("525"), and Rohrig Pollack ("RP") are single asset entities. 431 owns a multi-tenant retail center at 431 W. Ponce De Leon Avenue. [Case No. 13–53479, Doc. No. 36]. CPSW owned a shopping center at 4015 Holcomb Bridge Road, which was transferred to Rialto post-petition. [Main Case, Doc. No. 31]. 525 owns two properties located at 515 and 525 Moreland Avenue [Case No. 13–53481, Doc. No. 31]. These two parcels are part of the "Moreland Assemblage," [3] and are subject to a contract for sale that was approved by the Court on October 29, 2013. [Main Case, Doc. No. 136, 145, 345]. RP owned a property that was damaged by fire pre-petition. Rialto received the insurance proceeds for this property and sold the property at a foreclosure sale, with the obligation secured by RP's prop-

---

allowing Debtors to object to any document that would be responsive to Debtors' request that wasn't produced in an effort to avoid delaying the Hearing. [Main Case, Doc. No. 713, 754; Tr. 3/26; 10:39]. The Court also ruled on numerous evidentiary objections including objections to the qualifications of Debtors' experts. The Court concluded both Ms. Jackson and Mr. Gaudet were experts in the areas in which Debtor sought to qualify them. [Tr. 3/27;10:31; 3/28, 10:25].

2. Docket references are to the lead case docket, 13–53483.

3. The Moreland Assemblage is comprised of the following properties: 515 and 525 Moreland Avenue owned by 525; 1131 Glenwood Ave., 531 and 537 Moreland Ave. and 1152 Portland Ave. owned by CPII; and 1146 Portland Ave. owned by RI.

erty being paid in full. [Case No. 13–53485, Doc. No. 28].

Two of the Debtors, Cartel Properties II, LLC ("CPII") and Rohrig Investments, LP ("RI") own multiple properties. CPII owned thirteen properties on the petition date. [Case No. 13–53482, Doc. No. 28]. One of these properties has since been sold. [Main Case, Doc. No. 136, 145, 345]. RI owned 10 properties on the petition date. [Main Case, Doc. No. 62]. Three of these properties have since been sold. [Main Case, Doc. No. 136, 145, 167, 345]. There are no non-family partners that have an interest in the Debtor entities. In fact, Rohrig referred to the properties owned by the Debtors as the "family farm." [Tr. 3/31; 5:17 [4]].

Rialto, Debtors' senior secured creditor, purchased thirteen promissory notes (the "Notes") secured by Debtors' properties from BB & T, with whom Debtors had a twenty year relationship. The Notes matured and were not renewed thereby causing Debtors' default. On September 8, 2012, Debtors and Rialto entered into a forbearance agreement (the "Forbearance Agreement") which generally provided for Debtors to pay Rialto $12,000,000 on or before November 15, 2012, in order to obtain an extension of the term of the Notes. [D. Ex. 12]. The Debtors were not able to obtain the full amount required by the Forbearance Agreement, and Rialto filed suit in state court seeking appointment of a receiver. A receiver was in fact appointed on February 15, 2013. [D. Ex. 15]. Debtors filed these cases on February 19, 2013 (the "Petition Date").

Rialto filed proofs of claim in these cases totaling $20,771,741.46. [Main Case, Claim 2–1, Ex. 1]. It is undisputed that Rialto holds the largest claim in these cases. On or about May 10, 2013, the Debtors and Rialto entered into an agreed cash collateral order which included stipulated values for Rialto collateral totaling $23,646,042.25. [Main Case, Doc. No. 126]. Thus, it is generally agreed that Rialto's claim is oversecured.

Since the Petition Date, Rialto took possession of two properties, 4015 Holcomb Bridge Road, and 2977 E. Ponce De Leon, through deeds in lieu of foreclosure, reducing its claim by $5,600,000. Debtor further reduced its obligations to Rialto by selling 422–432 E. Howard Avenue and 118 Hillyer Place for $1.875 million. [Main Case, Doc. No. 167, 292]. Debtors have also obtained approval of the proposed sale of the Moreland Assemblage which has not yet closed but is anticipated to close in October, 2014. [Main Case, Doc. No. 136, 145, 345]. As of December 18, 2013, Debtors estimate Rialto is owed $10,771,740.96. [Main Case, Doc. No. 393]. As of the Hearing, Rialto estimates that it is owed $12,273,464.44 in principal plus interest, fees and costs for a total claim, before consideration of a possible § 506(b) claim, of $15,037,490.27. [Tr. 4/25; 11:29].

RI has additional secured creditors as follows: Oneaveious D. Lester owed $55,223, secured by property at 2271 Cascade Road; State Bank & Trust Co. ("State Bank") owed $330,000, secured by a junior lien on property at 246 W. Ponce De Leon Avenue; Touchmark National Bank ("Touchmark") owed $681,856, secured by property at 2781 E. College Avenue; and Wells Fargo Bank, N.A., ("Wells Fargo") owed $1 million on a line of credit secured by property at 805 Peachtree Street, # 620. RI also owes approximately $2.85 million on three separate lines of

---

**4.** References to the recording of the trial are "Tr. Date; time." References to Exhibits are as follows: "D. Ex. # " refers to Debtors exhibit # , "R. Ex. # " refers to Rialto Exhibit # and "TKP Ex. # " refers to TKP exhibit # .

credit to: Bank of North Georgia for $1.45 million related to financing of property at 878 Peachtree Road, Unit # CU–1; Brookhaven Bank for $2.35 million related to financing of property at 891 Howell Mill Road; and Georgia Primary Bank for $461,961, related to financing of property at 240 DeKalb Industrial Highway.

CPII has additional secured creditors as follows: Bank of North Georgia owed $2,788,777 on a non-recourse basis, secured by a senior lien on property located at 2575 Peachtree Road; Green Tree Servicing, LLC ("Green Tree") owed approximately $259,177.87 on a non-recourse basis, secured by a junior lien on property located at 2575 Peachtree Road; Chase Mortgage ("Chase") owed approximately $9,076 on a non-recourse basis, secured by property at 3057 Pharr Court, Unit G–3; CitiMortgage, Inc., ("CitiMortgage") owed approximately $450,294.20, secured by property at 10 Venetian Way, # 504; Midtown Bank & Trust Company ("Midtown") owed $3.88 million on a non-recourse basis, secured by property at 5965 Covington Highway; Regions Bank owed $176,461 on a non-recourse basis, secured by property at 433 N. McDonough Street; and Farmers & Merchant Bank ("Farmers") owed $174,061, secured by CPII's 50% interest in property at 433 N. McDonough Street.

Debtors scheduled approximately $16 million in unsecured claims, comprised largely of affiliate loans, equity lines of credit, and management fees. [Main Case, Doc. No. 62]. Thus, at the time of filing, Debtors claimed $57.546 million in assets, $30.4 million in secured debt, and $16 million in unsecured claims, including insider claims.

Debtors filed their initial plan of reorganization on August 20, 2013 [Doc. No. 268]. On November 11, 2013, Debtors filed a First Amended Plan of Reorganization [Doc. No. 351] and on December 18, 2013 the Debtors' Plan considered herein.

Although Rialto's debt has been paid down by several millions of dollars since the Petition Date, Rialto is dissatisfied with the Debtors' Plan and filed a competing liquidating plan on December 3, 2013 as amended on December 31, 2013 and thereafter on January 30, 2014, March 26, 2014 and April 23, 2014. [Doc. No. 371, 389, 402, 463, 762, 787].

## II. THE PLANS

### A. Debtors' Plan

The Debtors' Plan proposes to pay a 100% dividend to creditors over 10 years. Debtors propose to continue the current uses of their properties and to fund their Plan through cash flow generated by the properties and LLC interests. [Main Case, Doc. No. 266, 351, 390, 762]. Debtors propose to pay $356,315 in ad valorem taxes in 48 monthly installments with interest at the rate of 5.25%. Rialto's claims are to be paid in 120 installments amortized over 30 years with interest at the rate of 5.25%. The claims of Green Tree, State Bank, and Wells Fargo are also to be paid in 120 installments with interest of 4.32% for Green Tree and Wells Fargo, and 6.07%[5] for State Bank. The secured claims of Chase, Citimortgage, Midtown, Farmers, Oneaveious D. Lester, and Touchmark are all to be paid in accordance with the terms of their existing notes. General unsecured claims are to be paid in full on the Effective Date[6]. Finally, equi-

---

**5.** At the Hearing, Debtors acknowledged that State Bank, as a junior lien holder, should be paid interest at the rate of 6.07% rather than 5.25%.

**6.** Capitalized terms not otherwise defined herein have the meaning ascribed to them in either Debtors' Plan or the Rialto Plans which

ty interest holders will retain their interests and be paid at the end of the fiscal year after all other claims, the greater of an annual income tax distribution, but no more than 20% of Debtors' profit. At the end of the ten year plan period, Debtors propose to make balloon payments of $11.1 million by refinancing their remaining obligations. *Id.*

Debtors' Plan contemplates the formation of a joint venture, referred to by the Debtors as the "Rohrig Reorganized Debtors Joint Venture," or the "RRDJV." The joint venture does not legally combine the assets and liabilities of the Debtors, but allows the Debtors' management company to use the income of each Debtor freely to collectively implement the Debtors' Plan. The Debtors' Plan provides that Debtors "will operate on a consolidated basis until all Allowed Claims are paid in full and that their assets will be deemed substantively consolidated until all plan payment are complete." [Main Case, Doc. No. 390, pg. 2].

Additionally, Debtors' Plan provides that RI will assume, on confirmation, the TKP operating agreements (the "Operating Agreements"), and imposes an injunction in favor of Rohrig, which would prohibit collection efforts against him for the duration of the plan.

### B. Rialto Plans

The Rialto Plans are liquidating plans, which provide for appointment of a Liquidating Agent to liquidate all tangible and

intangible assets of each of the Debtors, to make a 100% distribution to non-insider creditors. [Main Case, Doc. No. 371, 389, 402, 787]. The Rialto Plans provide for the continued existence of each of the Debtors and keep the income and proceeds of each Debtor's property separate from each of the other Debtors.[7] *Id.* §§ 5.9, 7.3. The Plans generally provide for marketing and sale of non-Rialto collateral by the Liquidating Agent in six months, and if no sale occurs in that period, foreclosure by the secured creditor. The Rialto Plans provide further that a secured party can consent to have the Liquidating Agent market the property for more than six months. [Main Case, Doc. No. 402, § 5.8]. The Liquidating Agent is to be paid 4% of the gross revenues from the sales of property, would take possession of all of the Debtors' assets and manage them according to the Rialto Plans, which propose to be fully-administered within one year of the Effective Date, with the exception of any causes of action. In the interim, lien holders would receive monthly adequate protection payments equal to the greater of the adequate protection payments currently being paid and the net operating cash from the property. With respect to Rialto's claims, the Plans provide for marketing and sale of the Rialto collateral over twelve months and for payment of any deficiency claim Rialto may have.

The claims of Cartel Properties for management fees are subordinated in the Rialto Plans, and all insider loan claims are

---

plan being determined by the context of the surrounding text.

**7.** Debtors argue that Rialto's Plans are impermissible under § 1123(b)(6), because it is a combined plan for all the Debtors without formal consolidation. Rialto's Plans propose the same general treatment for all Debtors—liquidation—and is combined in one document. However, the classification chart, and

entirety of the document, makes clear that Rialto has classified the claims and counted votes on a per-Debtor basis. For means of efficiency and to reduce duplicative efforts, Rialto has discussed the formalities, functions, and implementation of the plan in one document. However, there is no attempt to consolidate the Debtors and this objection is overruled.

recharacterized as equity. Any rejection claim resulting from the rejection of the Debtors' management agreement with Cartel Properties is prohibited. In contrast, the Rialto Plans provide for assumption of the TKP Operating Agreements.

Rialto modified the Rialto Plans twice. The first modification provided for a new class of claims, the transferred property class. [Main Case, Doc. No. 463]. This class includes the secured claims of the Bank of North Georgia, Brookhaven Bank, and Georgia Primary Bank, which will be paid in accordance with the terms of their existing notes by the non-debtor property holder and will receive a lien on RI's equity interest, if any, in the LLCs that own the transferred property. The second modification provides for payment of interest to unsecured creditors who will be paid in full on the Effective Date with 5% interest accruing between the Petition Date and the Effective Date, with any unsecured claims that become allowed after the Effective Date accruing interest at a rate of 2.5%. [Main Case, Doc. No. 787]. This modification also addresses the secured claim of Green Tree and Midtown. With respect to Green Tree the modification provides that Green Tree's collateral cannot be sold for less than the amount of the creditor's claim and provides for Green Tree's foreclosure of its collateral if it is not sold by the Liquidating Agent within six months.

With respect to Midtown, the second modification provides for two options for treatment of Midtown's claim. The first allows Midtown to sell its collateral (5965 Covington Hwy) on the Effective Date in full satisfaction of its claim, while the second provides for the Liquidating Agent to sell Midtown's collateral with all proceeds, up to Midtown's claim amount, paid to Midtown in full satisfaction of its claim. The second modification further provides that nothing in the Rialto Plans precludes Midtown from pursuing its rights and remedies for any deficiency claim against any non-Debtor entity. The second modification further clarifies that the transferred property class creditors' deficiency claim is not barred but will, subject to certain conditions, be treated on par with the other unsecured creditors of RI. Finally, the second modification clarifies that the Rialto Plans do not prohibit collection efforts against Rohrig and other non-debtors and creditors may enforce their state law rights to collect amounts owed against Rohrig or other non-debtor entities.[8] [Main Case, Doc. No. 787, ¶ 7].

A total of 24 ballots were cast by holders of unsecured claims. In general terms, insiders, affiliates of Debtors and unsecured creditors accepted Debtors' Plan. Rialto and State Bank rejected Debtors' Plan. Unsecured creditors, insiders, affiliates and Midtown, Chase Mortgage, Farmers, Touchmark and Lester rejected the Rialto Plans. Rialto, State Bank, Green Tree and Wells Fargo accepted the Rialto Plans. [Main Case, Doc. No. 694].

---

8. Debtors' object to Rialto's first and second modification to its plans, arguing that the first modification impermissibly created a new class of transferred property owners, which violates § 1125 and 1127, and the second modification did not give creditors and interested parties sufficient notice or opportunity to object. Both amendments were filed in a timely manner, and did not adversely affect any claim or creditor. In fact, the amendments enhanced the treatment of specific creditors, and gave parties adequate notice of such changes. No parties appeared in opposition at the Hearing, or anytime after, in opposition to the amendments. Accordingly, this objection is overruled. *See In re American Trailer and Storage, Inc.*, 419 B.R. 412 (Bankr.W.D.Mo.2009); Fed.R.Bankr.PG. 3019(a).

## III. ANALYSIS

### A. Confirmation Requirements of § 1129(a)

█ Section 1129(a) sets forth sixteen requirements for confirmation of a plan and states, in part, "[t]he court shall confirm a plan only if all of the following requirements are met...." 11 U.S.C. § 1129(a). "To confirm a plan of reorganization the proponent has the burdens as to introduction of evidence and persuasion that each subsection of § 1129(a) has been satisfied." *In re Diplomat Construction, Inc.,* 481 B.R. 215 (Bankr.N.D.Ga.2012) (citing *In re Acequia, Inc.,* 787 F.2d 1352, 1359 (9th Cir.1986)). In the situation where all elements of § 1129(a) are met, except for subsection (a)(8), that is, when not all impaired classes of creditors vote to accept the plan, then § 1129(b) provides that the plan may still be confirmed as long as it does not discriminate unfairly and is fair and equitable. Both the Rialto Plans and the Debtors' Plan are non-consensual and must satisfy the fair and equitable requirements as well as the factors set forth in § 1129(a). Prior to considering whether a plan satisfies the cram down standard of § 1129(b), it must first satisfy each of the applicable § 1129(a) factors. *See In re Ambanc La Mesa Ltd. Partnership,* 115 F.3d 650, 653 (9th Cir.1997) (citing *In re L & J Anaheim Assoc.,* 995 F.2d 940, 942 (9th Cir.1993); *In re Bravo Enterprises USA, LLC,* 331 B.R. 459, 466 (Bankr.M.D.Fla.2005); *Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership,* 248 B.R. 668, 678 (D.Mass.2000)). Thus, the Court will consider each of those factors for each of the Rialto Plans and the Debtors' Plan prior to addressing cram down.

### 1. Rialto Plans

With respect to § 1129(a), the Court has reviewed the Rialto Plans and the evidence and concludes that subsections (a)(2), (4), (5), (6) and (12), are satisfied by the Rialto Plans and subsections (a)(13), (14), (15) and (16) are inapplicable. With respect to the remaining subsections of § 1129, Debtors raise a myriad of objections and arguments in opposition to confirmation of the Rialto Plans. The Court will now consider each of these objections.

#### a. Compliance with the Code—1129(a)(1)

Paragraph 1 of § 1129(a) requires that the plan comply with the applicable provisions of chapter 11, including §§ 1122 and 1123, governing classification and contents of the plan. Section 1122 provides for classifications of similar claims with other claims or interests. *In re Pattni Holdings,* 151 B.R. 628 (Bankr.N.D.Ga.1992) (Drake, J.) (citing *In re Atlanta West VI,* 91 B.R. 620, 625 (Bankr.N.D.Ga.1988) (Cotton, J.); *In re Club Associates,* 107 B.R. 385, 401 (Bankr.N.D.Ga.1989); *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990); *Piedmont Assoc. v. Cigna Property & Casualty Ins. Co.,* 132 B.R. 75, 78 (N.D.Ga.1991)). Section 1123 requires that the plan designate classes of claims as provided by § 1122, and set forth impairment or non-impairment, treatment of each class which cannot differ between members of a class absent consent and means for implementing the plan.

The Rialto Plans create the following classes in 431 and 525: (i) Tax Class; (ii) Rialto Secured Class; (iii) General Unsecured Class; (iv) Rialto Deficiency Class; (v) Management Fee Class; (vi) Insider Class; and (vii) Equity Class. The Rialto Plans for RP and CPSW create the following classes: (i) Tax Class; (ii) Unsecured Class; (iii) Rialto Deficiency; (iv) Management Fee Class; (v) Insider Class; and (vi) Equity Class. In CPII and RI, there are several properties such that there are additional classes for non-Rialto secured creditors. The Rialto Plan for CPII con-

sists of the following classes: (i) Tax Class; (ii) Rialto Secured Class; (iii) Green Tree Class; (iv) Chase Mortgage Class; (v) CitiMortgage Class; (vi) Midtown Class; (vii) Farmers Class; (viii) General Unsecured Class; (ix) Rialto Deficiency Class; (x) Management Fee Class; (xi) Insider Class; and (xii) Equity. Similarly, the Rialto Plan for RI consists of the following classes: (i) Tax Class; (ii) Rialto Secured Class; (iii) Lester Class; (iv) State Bank Class; (v) Touchmark Class; (vi) Wells Fargo Class; (vii) General Unsecured Class; (viii) Rialto Deficiency Class; (ix) Management Fee Class; (x) Insider Class; and (xi) Equity. The Rialto Plans specify which classes are impaired and the treatment of members of each class are the same. Thus, the Rialto Plans satisfy § 1129(a)(1).[9,10]

■ Debtors argue that the Rialto Plans do not comply with Georgia law because they provide the Liquidating Agent with an irrevocable power of attorney which is not voluntary and make him the Manager of each of the Debtors postconfirmation. Contrary to Debtors' argument, three circuit courts have considered whether § 1123(a) provides for preemption of applicable non-bankruptcy law, and each of the circuits have concluded that, although the preemption is not without limit, that the unambiguous language of § 1123(a) does so provide. *See In re Federal–Mogul Global, Inc.*, 684 F.3d 355, 374 (3rd Cir.2012) ("plain language of 1123(a) evinces clear congressional intent for a preemptive scope that includes the transactions listed under § 1123(a)(5) as adequate means for the plan's implementation"); *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1154 (4th Cir.1988); *In re Pacific Gas & Electric Co.*, 283 B.R. 41, 47 (N.D.Ca.2002). Further, the "quoted language clearly means, and the case law so holds, that the provisions of a plan as articulated in § 1123(a) can be effected without regard to otherwise applicable non-bankruptcy law, including the corporate law of the State of Delaware or any other state corporation laws having bearing on the debtors." *In re Stone & Webster, Inc.*, 286 B.R. 532, 542 (Bankr.D.Del. 2002) (citing 7 *Collier on Bankruptcy* ¶ 1123.LH[4], pg. 1123–27 (15th ed. rev. 2002)); *see also Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1154 (4th Cir.1988) (holding § 1123(a)(5)(D) overrides non-bankruptcy law "by its plain language."); *In re Pacific Gas*, 283 B.R. at 47 (N.D.Ca.2002) ("a review of the text and legislative history of [§ 1123(a) ] demonstrates that Congress intended expressly to preempt non-bankruptcy laws that would otherwise apply to bar, among other things, transactions necessary to implement the reorganization plan."). The Court agrees that the plain language of § 1123(a) preempts the corporate law relied upon by Debtors and this objection is without merit.

Debtors next argue that the provisions for the "Allowed Rialto Deficiency Claim"

**9.** Debtors object under § 1129(a)(1) and (b)(2)(B) that there are discrepancies between the disclosure statement and plans which are conflicting. However, section 16.7 of the Rialto Plans states "[i]n the event that provisions of the Disclosure Statement and this Plan conflict, the terms of this Plan shall govern and control." Accordingly, the objection is overruled.

**10.** Debtors argue that net proceeds from the sale of encumbered properties may be used by the Liquidating Agent to pay the allowed claims against the Debtor property owner but do not mandate such payment in violation of § 1129(a)(1). The Liquidating Agent is required to comply with the Rialto Plans and the Code. *See* §§ 7.3, 10.2 and 10.3 of the Rialto Plans. Accordingly, this objection is overruled.

contained in the Rialto Plans violate § 1123(b)(6) because the Rialto Plans propose to pay claims Rialto does not have which is inconsistent with Title 11. [Main Case, Doc. No. 402, pg. 52–53; Doc. No. 742, pg. 13]. Based upon Rialto's proofs of claim filed in these cases and the provisions of the Forbearance Agreement, [D. Ex. 12], Rialto has claims against each of the Debtors based upon thirteen promissory notes, executed by the Debtors in favor of BB & T or its predecessor and secured by all of the Rialto Properties. The Rialto Plans provide, in relevant part, with respect to this claim, the "Allowed Secured Claim of RREF'" as follows:

> ... [t]he Allowed Secured Claim of RREF includes, without limitation, RREF's attorneys' fees, costs and charges allowable under 11 U.S.C. § 506(b), (a) interest (at the contract rate and default rate) on such claim, (b) RREF's reasonable fees, costs and charges provided for under the loan documents executed by Debtors (c) all amounts paid by RREF to fund any payment under or pursuant to the Plan to any Holder of any Claim against Debtors (other than Claims held by RREF) and (d) protective advances within the meaning of O.C.G.A. § 44–14–2(a)

[Main Case Doc. No. 371, p. 53]. With respect to any unsecured claim Rialto may have, the Rialto Plans define "Allowed Rialto Deficiency Claim" as follows:

> the indebtedness owed by Debtors to RREF that exceeds the value of the Rialto Properties that serve as Collateral for the indebtedness owed to RREF,

including the cross-collateralized indebtedness owed by Debtors to RREF, and further including any deficiency owed by Debtor after one or more of the Rialto Properties [11] are sold by the Liquidating Agent or Rialto. The Allowed Rialto Deficiency Claim includes without limitation, RREF's attorneys' fees, costs and charges allowable under 11 U.S.C. § 506(b), (a) interest (at the contract rate and default rate) on such claim, (b) RREF's reasonable fees, costs and charges provided for under the loan documents executed by Debtors, (c) all amounts paid by RREF to fund any payment under or pursuant to the Plan to any Holder of any Claim against Debtors (other than Claims held by RREF) and (d) protective advances within the meaning of O.C.G.A. § 44–14–2(a)

[Main Case, Doc. No. 371, pg. 53].

The issue posed is whether this definition creates claim(s) that do not exist? The Court concludes that it does not, but that the definition as written is redundant in including cross-collateralized debt and deficiency claims from sale of "direct debt" [12] collateral, because the initial sentence of the defined term contemplates both of the including phrases. The Court concludes further that the Allowed Rialto Deficiency Claim class in each Rialto Plan provides for treatment of a deficiency claim if one arises and thus does not violate § 1123(a)(6) as argued by Debtors. Until all of Rialto's collateral is liquidated and applied to direct debt, then to any cross collateralized unpaid debt, and any

---

**11.** Rialto Properties is defined as "246 W. Ponce Property, 340 E. Paces Property, 422 Howard Property, 431 W. Ponce Property, 1465 Howell Mill Property, 2670 E. College Property, 2812 E. College Property, 3084 Roswell Property and the Moreland Assemblage Property" [Main Case, Doc. No. 402, pg. 59].

**12.** Debtors' Disclosure Statement refers to the debt owed by each Debtor to Rialto as "direct debt." [Main Case, Doc. No. 393]. The Court finds this a useful term to use in describing these obligations.

allocated share of fees and costs that may be allowed, it is not possible to determine if Rialto will have any remaining claim amounts that are unsecured and within the Allowed Rialto Deficiency Claim. It is possible that some amount owed to Rialto will remain after all Rialto collateral is liquidated and applied to the Allowed Rialto Secured Claim such that it is possible that a deficiency will remain. Providing treatment of these contingent claims is not inconsistent with Title 11.

Debtors argue further that payment of "unallowed claims," that is the § 506(b) claims that have not yet been allowed, prior to payment of the management fee claims is inconsistent with the Code. [Main Case, Doc. No. 742, pg. 13]. Section 506(b) provides that interest and reasonable fees and costs can become part of an oversecured creditor's secured claim to the extent of the collateral value with allowance of such claims being accomplished pursuant to § 502. *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *In re Welzel*, 275 F.3d 1308 (11th Cir.2008); *In re New Power*, 313 B.R. 496, 509–510 (Bankr.N.D.Ga. 2004) (§ 506(b) allows preferential treatment for attorneys' fees claims asserted by oversecured creditors it does not preclude undersecured creditors from collecting contractually set attorneys' fees as an unsecured claim). That being the case, treatment of such contingent claims is not contrary to the Code. Finally, Debtors argue that any advances made as provided in the definition of Allowed Rialto Deficiency Claim are not authorized under the Rialto Plans and further that these would have to be non-recourse claims. Both the deeds to secure debt executed by Debtors and O.C.G.A. § 44–14–2 provide for such advances and are thus authorized. Further, to the extent advances are made the amount advanced would be chargeable against the Debtor whose property was benefited. Thus, each of the objections raised based upon the definition of Rialto Deficiency Claim and treatment of same is overruled.[13]

Debtors object further that the Rialto Plans do not comply with § 1129(a)(1) because of the treatment of the potential rejection claim of Cartel Properties. Specifically, Debtors argue that the management contract with Cartel Properties is rejected without the option of pursuing rejection damages which is different from the treatment for other rejected contracts in violation of § 1123(a)(4) and § 502. Mr. DeWitt ("DeWitt"), Debtors' controller, testified that the management contract is oral and that he does not know the contract terms other than the amount of the management fee. There was no evidence of any other terms of the agreement. The agreement is thus different than other executory contracts of the Debtors and separate classification is allowable. *See In re Club Assocs.*, 107 B.R. 385, 401 (Bankr. N.D.Ga.1989) (stating that, "[a]lthough a debtor may not place dissimilar claims in the same class, a debtor may place similar claims in different classes as long as the classification is not designed for abusive or manipulative purposes") (citing *In re Atlanta West VI*, 91 B.R. 620 (Bankr.N.D.Ga. 1988); *In re AG Consultants Grain Divi-*

---

13. To the extent Debtors' object to Rialto claiming the full amount owed to it in each case, the objection is overruled. [Main Case, Doc. No. 742, pg. 12–13]. By virtue of the cross collateralized debt owed to Rialto, Debtors' property secures the entire debt owed to Rialto and thus Rialto has an *in rem* claim in each case (except RP and CPSW) as well as a direct (recourse) debt. There are timing issues with determining what the amount of the *in rem* claim may be paid in each case, and the amount will change as collateral is liquidated, but as of the Effective Date inclusion of the full debt is not inappropriate.

*sion, Inc.,* 77 Bankr.665 (Bankr.N.D.Ind. 1987); *In re Jersey City Medical Center,* 817 F.2d 1055 (3d Cir.1987)). Debtors' objections having been considered and overruled, the Court finds that the Rialto Plans satisfy the requirements of § 1129(a)(1).

### b. Filed in Good Faith—§ 1129(a)(3)

Section 1129(a)(3) requires that the plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). The good faith requirement merely requires "that there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick,* 49 F.3d 1524, 1526 (11th Cir.1995). In assessing whether the plan was proposed in good faith, the assessment is focused on the plan itself, while also considering the totality of circumstances surrounding the Plan. *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.),* 244 F.3d 1289, 1300 (11th Cir.2001). The good faith requirement is met when the plan is proposed with a "legitimate and honest purpose to reorganize and has a reasonable hope of success." *Id.*

With respect to the requirement that the plan not be proposed by any means forbidden by law, "[c]ourts addressing the issue have uniformly held that § 1129(a)(3) does not require that the contents of the plan 'comply in all respects with the provisions of all nonbankruptcy laws and regulations.... Instead, § 1129(a)(3) requires that only the *plan's proposal,* as opposed to the contents of the plan, be in good faith and in compliance with all nonbankruptcy laws.'" *In re General Development Corp.,* 135 B.R. 1002, 1007 (Bankr.S.D.Fl.1991) (emphasis in original) (citing *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 59 (Bankr.S.D.N.Y. 1990); *In re Food City,* 110 B.R. 808, 812–13 (Bankr.W.D.Tx.1990)). "Section 1129(a)(3) focuses not on the terms of the plan and its means of implementation but on the manner in which the plan 'has been proposed.'" *Irving Tanning Co. v. Maine Superintendent of Insurance, et al.,* 496 B.R. 644, 660 (1st Cir. BAP 2013).

The Debtors argue that the Rialto Plans serve only Rialto's interest while the Debtors' Plan pays all claims in full and that the requirement that the Rohrig family must vacate two condominiums owned by the Debtors and occupied by the family members is indicative of bad faith. [Main Case, Doc. No. 742, pg. 30]. It is true that the Rialto Plans are liquidation plans, however, liquidations are specifically authorized by § 1123, and while Debtors are vehemently opposed to the proposed treatment of insider and affiliate claims, the proposed payment in full of all claims except those of insiders and affiliates is not inconsistent with the purposes of the Code. *See In re SW Boston Hotel Venture, LLC,* 460 B.R. 38, 66–67 (Bankr.D.Ma.2011) (treating insider claims less favorably than other creditors is not mandated under the Bankruptcy Code but is certainly allowable).[14]

Debtors further object to the recharacterization of equity interests through the

---

**14.** The Court notes that Debtors assert that Rialto's proposed treatment of insiders smacks of bad faith while Rialto implies that Debtors failure to liquidate more property is in bad faith. This has been a contentious case with parties who very clearly believe the other has bad motives. These general feelings and bad blood do not establish a lack of compliance with the Code by the plan proponents and absent specific allegations of violations, the Court finds that the general allegations of bad motives on both sides do not establish that either Debtors or Rialto have failed to comply with the Code and § 1129(a)(2) is satisfied with respect to each of their plans. Nor do these allegations constitute bad faith within the meaning of § 1129(a)(3).

Rialto Plans arguing that it is necessary to commence an adversary proceeding when seeking to recharacterize debt and thus the Rialto Plans violate § 1129(a)(3). While the recharacterization of debt has typically been addressed in the Eleventh Circuit through an adversary proceeding, there is no rule requiring such. Indeed, the Seventh Circuit has been cited for the proposition that "[w]here recharacterization is sought, courts have not specified whether the relief must be sought by an adversary proceeding or contested matter." 2 Bankruptcy Litigation § 10:85 (citing *In re Airadigm Commc'ns Inc.*, 616 F.3d 642, 657 n. 11 (7th Cir.2010)).

▆▆▆▆ Recharacterization of debt does not fall under one of the ten exclusive categories identified in Fed. R. Bankr.P. 7001 that requires an adversary proceeding. *See In re Micro–Precision Technologies, Inc.*, 303 B.R. 238, 243 (Bankr.D.N.H. 2003) (finding that a request to recharacterize a claim "is not a type of action listed in Rule 7001 that must be brought as an adversary proceeding"). However, even if recharacterization did fall within one of the Rule 7001 categories, exceptions are made when the issue is addressed through a plan. *See, e.g.*, Fed. R. Bankr.P. 7001(7) and (8) ("a proceeding to obtain an injunction or other equitable relief, except when a ... plan provides for the relief," and "a proceeding to subordinate any allowed claim or interest, except when a ... chapter 11 ... plan provides for subordination."). In determining whether a confirmed plan binds a particular party, courts generally evaluate whether that party received adequate notice that his rights would be modified by the plan. *In re Stansbury*, 403 B.R. 741, 746 (Bankr. M.D.Fl.2009). The recharacterization of equity by the Rialto Plans is sufficient to notify the affected parties and provide an opportunity to object, because all parties

received notice of the Hearing and the Rialto Plans clearly indicate that they seek to recharacterize insider debt. The parties who could be affected by the recharacterization are intimately familiar with the court proceedings and have received ample notice of the provisions of the Rialto Plans. The Court finds that the Rialto Plans provide sufficient notice of the proposed recharacterization and this objection is overruled.

▆▆▆ Debtors object that Rialto's Plans contemplate the disposition of all estate property without an analysis of the tax consequences, violating § 1129(a)(3) and (d). The evidence showed that the tax consequences would affect only non-Debtor entities. A review of the Debtors' organization charts proves this to be true: the Debtors are all either LLCs or LPs, which are pass-through entities for whom taxation is imposed on the members. [R. Ex. 7]. While 525 and CPSW are owned partially by other Debtor entities, because all of the Debtors are pass-through entities, any tax consequences flow to the members of the entity, and not the entity itself. As such, there will be no tax consequences to the Debtors. Accordingly, the objection is overruled and the Rialto Plans satisfy § 1129(a)(3).

### c. Best Interests of Creditors— § 1129(a)(7)

Section 1129(a)(7), known as the "best interest of creditors" test, requires that each holder of a claim in an impaired class has either accepted the plan or will receive at least as much as it would receive in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7). It appears that Rialto used the liquidation analysis attached to the Debtors' Disclosure Statement which was amended by Debra J. Jackson, one of Debtors' two experts ("Jackson"), prior to the Hearing. Jackson, who prepared the

liquidation analysis, testified that, in preparing Debtors' liquidation analysis, [D. Ex. 4], she reviewed and relied on the cash collateral budgets, the Debtors' monthly operating reports, Debtors' statements of financial affairs, the stipulated values for Rialto's real estate collateral, the Debtors' Plan, Disclosure Statement and § 326 of the Code. The major changes in Debtors' liquidation analysis from the exhibit included with the Disclosure Statement and Debtors' Ex. D3 and 4 was the addition of RI's LLC interests and the removal of a double counting of income from the 246 W. Ponce De Leon property. Thus, there is a large discrepancy in Rialto's valuation of RI's LLC interests and the Debtors. Rialto values the LLC interests at zero and Debtors value them at $15,751,188.[15]

Jackson did not prepare an independent valuation for the LLC interests, rather she relied upon Rohrig's opinion of their value and the only evidence of value for these interests is the $10 million offer made by TKP for three of RI's LLCs. Given the amount of that offer and the fact that RI owns several more LLCs in addition to the TKP/RI LLCs it appears that the Debtors valuation is more likely accurate than Rialto's valuation of zero and the Court will accept Debtors' valuation for purposes of the liquidation analysis.

In each of the cases of 431, CPII, RI and RP the assets available for liquidation are sufficient to pay all creditors, including both insider and non-insider unsecured creditors in full. [R. Ex. 49]. Each of these Debtors, according to the liquidation analysis, is solvent such that unsecured creditors would be entitled to interest on

their claims. *See* 11 U.S.C. § 726(a)(5). Each of the Rialto Plans provides for payment of interest on non-insider unsecured claims at a rate of 5.0% to the Effective Date, and payment in full on the Effective Date. To the extent a claim is allowed after the Effective Date the Rialto Plans provide for interest at the rate of 2.5%. Section 726(a)(5) provides for interest "at the legal rate from the date of the petition ..." *See* 11 U.S.C. § 726(a)(5). Although the Courts are not unanimous on what the legal rate for purposes of § 726(a)(5) is, this Court holds that the legal rate is the federal judgment rate. *See Onink v. Cardelucci*, 285 F.3d 1231 (9th Cir.2002). Thus, with respect to the return to unsecured non-insider creditors, the Rialto Plans pay at least as much as a chapter 7 liquidation, and indeed would pay more because of the higher rate of interest paid.

With respect to the management fee claim, which is an insider unsecured claim, the same is not true because in solvent chapter 7 cases unsecured claims are paid interest and the management fee claims are not paid interest in the Rialto Plans for 431, CPII, RI and RPG. *See* 11 U.S.C. § 726(a)(5); [Main Case, Doc. 371, § 5.1(e)]. Thus, the management fee claims in these four cases would receive more in a chapter 7 liquidation than under the Rialto Plans for 431, CPII, RI and RP and those plans do not satisfy the best interest of creditors test.

In 525 and CPSW there are not sufficient assets to pay the Rialto Secured Claim, so that general unsecured creditors receive more through the Rialto 525 Plan

---

**15.** The other differences in amounts included in Rialto's liquidation analysis and Debtors were not explained. For example, in 525, Rialto utilized a fair market value estimate that was $511,007 higher for the 525 real estate, but a liquidation cost that was only $62 lower than Debtor's estimated liquidation costs. It appears that this cost in Debtor's analysis was 6% of the projected sales price of the real estate which the Court assumes is a projected broker's fee. Again there was no evidence presented regarding how the numbers in the liquidation analysis for Rialto were determined. [D. Ex. 4; R. Ex. 49].

and the CPSW Plan than they would in chapter 7. With respect to the management fee claims, those claims would not receive a distribution in either case so § 1129(a)(7) is satisfied in the 525 and CPSW cases. Thus, only two of the six Rialto Plans satisfy § 1129(a)(7).

### d. Treatment of Tax Claims— § 1129(a)(9)

Section 1129(a)(9) provides treatment for priority claims. Debtors argue that under § 3.3 of the Rialto Plan, Administrative Claims are not paid in full on the Effective Date, violating § 1129(a)(9)(A). The Rialto Plans provide for payment of Administrative Claims as follows:

> one of the following treatments, in the sole discretion of the Liquidating Agent: (i) to the extent not already paid, on the later of the Effective Date or thirty (30) days after the date on which such Administrative Claim becomes an Allowed Claim, or in each such case, as soon as reasonably practicable thereafter. Cash in the full amount of such Allowed Administrative Claim; (ii) to the extent not yet due and payable, payment in accordance with the terms and conditions of the particular transaction giving rise to the Administrative Claim; (iii) to the extent such Claims are Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6), Cash in accordance with the applicable schedule for payment of such fees; or (iv) treatment on such other terms as may be mutually agreed upon in writing between the Holder of such Allowed Administrative Claim and the Liquidating Agent; provided, however, that interim and/or final payment of Allowed Administrative Claims approved by the Bankruptcy Court shall be paid at the time of and in accordance with such Bankruptcy Court approval. To the extent that Allowed Administrative Claims are alloca-

ble to any particular Debtor or any particular real property owned by a Debtor, the Liquidating Agent shall cause the Allowed Administrative Claim allocable to the particular Debtor or real property to be paid by the particular Debtor or from the revenues of the particular real property to which the services are allocable.

[Main Case, Doc. No. 371, 787, § 3.3].

Section 3.3 of the Rialto Plans outlines contingencies for post-Effective Date payments, or later approved claims, "to the extent not already paid." Logically, claims that are not yet allowed claims or are not yet due cannot be paid on the Effective Date. The Rialto Plans assume payment of Administrative Claims, to the extent possible, on or before the Effective Date. *See, e.g., In re Dan River, Inc.,* 2006 WL 6589891, at *2 (Bankr.N.D.Ga.2006) (Drake, J.); *see also In re Holley Garden Apartments,* 238 B.R. 488 (Bankr.M.D.Fla. 1999). Accordingly, the objection is overruled.

With respect to priority tax claims, § 1129(a)(9)(C)(iii) requires that the claims be paid in "a manner not less favorable than the most favored non priority unsecured claim." Debtors argue that under § 1129(a)(9)(C) and (a)(3), the Rialto Plans violate the Code because they propose to pay tax claims after the Effective Date without interest, that the tax claims are paid differently based on who holds the note, and that the Rialto Plans propose that a purchaser of the property pay the taxes. The Rialto Plans provide that priority tax claims are to be treated as follows:

> On the later of (i) the Effective Date; (ii) forty-five (45) days after the date on which a Priority Tax Claim becomes an Allowed Claim, or, in each such case, as soon as reasonably practicable thereafter; (iii) the sale by the Liquidating

Agent of the real property to which the Allowed Priority Tax Claim relates or from the revenues generated by the real property to which the Allowed Priority Tax Claim relates; or (iv) thirty (30) days after the date on which the property is sold, whether via foreclosure or a credit bid, by the secured lender with a security interest in the real property to which the Allowed Priority Tax Claim relates, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full and complete satisfaction, discharge and release of its Priority Tax Claim, Cash in the full amount of the Allowed Priority Tax Claim. With respect to the Rialto Properties, Allowed Priority Tax Claims will be paid no later than 395 days from the Effective Date. With respect to all non-Rialto Properties, Allowed Priority Tax Claims will be paid no later than seven (7) months from the Effective Date. If the real property is sold by the Liquidating Agent, the Allowed Priority tax claim will be paid from the Net Proceeds from the sale of the real property no later than six (6) months from the Effective Date for non-Rialto Properties and one (1) year from the Effective Date for Rialto Properties. If the real property is sold by the secured lender, the Entity acquiring title, whether via foreclosure or credit bid, will pay the full amount of the allowed Priority Tax Claim no later than seven (7) months from the Effective Date for non—Rialto Properties and thirteen (13) months from the Effective Date for Rialto Properties.

[Main Case, Doc. No. 371, 787, § 3.5]. First, there is no prohibition against the purchaser of the property being required to pay ad valorem taxes. Second, Debtors are correct in that § 511 requires that the tax creditor receive interest at the applicable non-bankruptcy rate. However, Michael Peskin ("Peskin"), Vice President of Rialto Capital Advisors of New York, testified at the Hearing that tax claims would be paid with interest in accordance with Georgia law. [Tr. 4/25; 10:25]. This issue, like several others raised by the parties, could be resolved by language in a confirmation order incorporating Rialto's intent as stated by Peskin, however, the Rialto Plans as written do not provide for interest on the tax claims and the objection is sustained.

### e. The Vote—§ 1129(a)(10)

Section 1129(a)(10) requires that at least one class of impaired claims has voted for the plan. Debtors object to the fact that Rialto voted in favor of its own plan, stating that under § 1129(a)(10), and citing one secondary source, it is an "open issue" whether a plan proponent can vote in favor of its own plan. Section 1126(a) specifically provides that each holder of a claim has the right to vote for or against a proposed plan. There is no language in the Code that would limit such votes to non-proponents of a plan. Rather, the Code provides for designating votes cast "not in good faith". *See* 11 U.S.C. 1126(e); *In re Allegheny Intern., Inc.*, 118 B.R. 282 (Bankr.W.D.Pa.1990); *In re Federal Support Co.*, 859 F.2d 17 (4th Cir.1988) (noting that self-interest is not an ulterior motive or not in good faith); *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388 (Bankr. N.D.Ga.1994) (same). Here, the objection is overruled because there is no evidence of lack of good faith or that Rialto is acting other than as a creditor to protect its economic interest. Rialto voted in favor of each of the Rialto Plans as an impaired class and § 1129(a)(10) is satisfied.[16]

---

**16.** Rialto currently has a contingent claim against RP on account of possible allocation

### f. Feasibility—§ 1129(a)(11)

Section 1129(a)(11) states that for a plan to be confirmed, it must be feasible in that, "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

The use of the word, likely, requires the Court to assess whether the plan offers a reasonable "probability of success, rather than a mere possibility." While § 1129(a)(11) does not require the debtor to guarantee success, establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success. The purpose of the feasibility requirement [ ]is to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation. A determination of feasibility must be "firmly rooted in predictions based on objective fact."

*In re Diplomat Constr., Inc.*, 2009 WL 6498180, at *2 (Bankr.N.D.Ga.2009) (Diehl, J.) (internal citations omitted). The Rialto Plans are liquidating plans such that valuation is a key issue. *See In re Hoosier Hi–Reach, Inc.*, 64 B.R. 34, 38 (Bankr.S.D.In. 1986) (finding that a two-year old appraisal of real property was not probative evidence of value).

Debtors object to the valuations used for the properties in Rialto's liquidation analysis, claiming they are outdated, and that some of the non-Rialto property values amount to nothing more than speculation. Many of the current property values come from the stipulated values in Debtors' recurring cash collateral orders. Other valuations are taken directly from Debtors' schedules. [R. Ex. 51]. While the testimony at the Hearing from all parties (Jackson, Gaudet, and Glass) was that the real estate market had rebounded in Atlanta and was generally increasing in value, some property values listed by Rialto deviate from Debtors' schedules without explanation or evidence as to the basis for the valuation. *Id.* Additionally, Rialto's budget assumes vacancy rates of 10%. There was no evidence as to how this figure was calculated. The Court finds that the use of the stipulated values and assumed rates of vacancies is not unreasonable especially when Debtor's expert testified that the historical vacancy rate was within this range. Further, because Rialto relied on Debtor's valuations and the deviations from those valuations are not material, the Court concludes that these variations do not undermine Rialto's feasibility analysis.

Debtors argue further that the Liquidating Agent cannot sell their LLC interests because the relevant operating agreements do not permit sales over the objections of LLC members who retain their rights under the Rialto Plans. The argument continues that because this is so the Rialto Plans are not feasible. An analysis of Debtors' objection requires a determination of "whether the [Liquidating Agent's] rights are governed by Bankruptcy Code § 541(c)(1) or by § 365(e)(2) ... the latter provision, if applicable, permits the enforcement of state and contract law restrictions ... whereas the former provision, if applicable, would

of fees and costs to RPG. The Code provides that a party in interest may file a plan and that a claim includes a contingent claim, thus in the context of this case where Rialto is clearly a party in interest and holds a contin-

gent claim, the Court finds that Rialto may propose a plan for RP and cast a ballot in that case. *See* 11 U.S.C. § 1121(c): 11 U.S.C. § 101(5)(A).

render such restrictions and conditions unenforceable." *In re Ehmann,* 319 B.R. 200, 202 (Bankr.D.Az.2005). Further, to determine the applicable code section, the Court must determine if the operating agreements are executory contracts. *Id.; In re Knowles,* 2013 WL 152434, at *2–3 (Bankr.M.D.Fl.2013). "There is a difference of opinion among the courts regarding whether an operating agreement of a limited liability company is an executory contract. The decision largely hinges on the facts and circumstances of each individual case." *Knowles,* 2013 WL 152434, at *2–3.

As discussed with respect to the Operating Agreements, if the provisions of the operating agreements are enforceable pursuant to § 365(e)(2), and if the agreements prohibit sale without full consent of the member, then the Debtors' opposition may be well founded with respect to the Rialto Plans for CPII, RI and CPG. *See* pg. 38–39, *infra.* However, the only operating agreements that were introduced into evidence are those for the LLCs owned by TKP and RI and the Court has no evidence of the terms of any other of the Debtors' operating agreements. Additionally, Debtors object that § 9.1 of the Rialto Plans is "nonsensical," because it provides that all executory contracts and unexpired leases will be rejected, and to the extent that the Debtors' operating agreements are executory contracts, the Liquidating Agent will be unable to "succeed to all of the powers as would have been previously exercisable by the shareholders of each Debtor." [Main Case, Doc. No. 742, pg. 24–25]. This argument may have merit, but neither the operating agreements nor any other evidence regarding the executory or non-executory nature of the Debtors' operating agreements were presented. Thus, Rialto failed to sustain its burden under § 1129(a)(11) and Debtors objections are sustained.

The Rialto Plans provide for funding "through the collection and liquidation by the Liquidating Agent of the Assets (defined as, "all of the property, as defined in section 541 of the Bankruptcy Code, of the Debtors and their Estates ... as such property exists on the Effective Date or thereafter) ... into Cash. To the extent the Assets and proceeds thereof are insufficient to pay Allowed Unsecured Claims (other than Insider and Affiliate claims), any shortfall will be funded by RREF in Cash to the Liquidating Agent for distribution as and when provided in the Plan." [Main Case, Doc. No. 402, § 7.7, pg. 31]. Analyzing this provision using the property values stipulated in May, 2013, as both Debtors and Rialto have done, shows that three of the Debtors, 431, CPII and RI own property of a value sufficient to pay the direct Rialto debt in full. RP has already paid Rialto's direct debt in full. Given that, and the provisions providing for payment of plan expenses from assets of the particular debtor to which the expense applies, it appears that Rialto would fund expenses and payments in solvent cases which would be added to its claim and paid from revenue generated from sales of its collateral. [Main Case, Doc. No. 402, pg. 29]. In order to fund plan expenses Rialto has provided for a "back stop" for it and a contribution agreement with Rialto Real Estate Fund, LPG. [R. Ex. 48, 51]. Thus, the feasibility analysis for the Rialto Plans necessarily includes the proposed back stop.

The evidence as to the Rialto back stop was limited to a one page balance sheet from Rialto and the testimony of Peskin. The balance sheet includes $192,575 in cash and cash equivalents, $37,157,132 in total loans receivables, and $435,192 in accounts receivables, for total receivables of $37,592,324. Peskin also testified that Rialto Real Estate Fund, LP, had agreed

to contribute funds necessary to the Rialto Plans and that Rialto Real Estate Fund, LP is a $700 million fund. [Tr. 4/24; 3:02]. There was no evidence as to what types of assets are held by Rialto Real Estate Fund, LP or the liquidity or illiquidity of the same. Similarly, there was no evidence regarding the collectability of Rialto's accounts receivable or cash flow with which to analyze the ability to provide back stop funding.

█ The evidence did establish that Rialto has $192,575 in cash and cash equivalents and the Debtors have $169,835 in cash. [D. Ex. 3]. Thus, as of the Effective Date Rialto would have up to $362,410 available to fund expenses and payments due prior to property sales. Both parties agree in their liquidation analyses that approximately $120,000 of administration fees will be due on the Effective Date, which would leave approximately $242,410 in cash to administer the Rialto Plans. The parties disagree in their liquidation analyses as to the amount of unsecured claims on the Effective Date: Debtor projects $24,348 [D. Ex. 4], while Rialto projects $1,864. [R. Ex. 51]. Regardless, Rialto has sufficient cash to pay the higher amount of unsecured claims on the Effective Date. The Rialto Plans also provide that priority tax claims may be paid on the Effective Date, or on a date thereafter when the claim becomes effective or when the property sells. Debtor's estimate in their plan that $356,315.92 is owed to third parties holding tax fi.fas and Rialto utilizes this amount in its liquidation analysis. The Debtors' schedules disclose that $121,945.99 is owed on account of assigned tax claims and a total of $117,380.39 in class 1 tax claims voted for Debtors' Plan.[17] To the extent the higher amount is owed, the evidence did not establish that Rialto has sufficient cash to pay the amounts owed to third parties holding tax claims. Consequently, it is unclear if Rialto has access to cash in the amounts necessary to fund the Rialto Plans as of the Effective Date and has not established that the Rialto Plans are feasible.

Although the Rialto Plans do not satisfy the requirements of § 1129(a) and cannot be confirmed, in an effort to advance the reorganization process in these cases, the Court will address the objections to the Rialto Plans raised under § 1129(b).

## 2. Confirmation Requirements of § 1129(b)

Section 1129(b) of the Code provides that if all requirements of § 1129(a) are met except for (a)(8), then a plan may still be confirmed if it meets the "cram down" requirements of § 1129(b). If at least one class of impaired creditors accepts the plan, then if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan, then the plan may still be confirmed. Section 1129(b)(2) provides, with respect to secured claims, as follows:

(1) Notwithstanding section 510(a) of this title [11 USCS § 510(a)], if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

17. *See* Case Nos. 13–53481, Doc. No. 31; 13–53482, Doc. No. 28.; 13–53483, Doc. No. 62; 13–53485, Doc. No. 28.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)

(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title [11 USCS § 363(k)], of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

### a. Treatment of Non–Rialto Deficiency Claims

One of Debtors' objections is that the Rialto Plan unfairly discriminates against the Lester and Touchmark deficiency claims because the Allowed Rialto Deficiency Claim specifically provides for Rialto's potential deficiency claim while the Lester and Touchmark deficiencies are disallowed. The Code does not prohibit discrimination, rather it prohibits unfair discrimination. *In re Pattni Holdings,* 151 B.R. 628, 631 (Bankr.N.D.Ga.1992) (Drake, J.) ("Although the Code prohibits "unfair discrimination," it does not prohibit all discrimination.... Factors used by many courts in determining the fairness of the discrimination include whether there is a reasonable basis for the discrimination, whether the debtor can confirm a plan without the discrimination, whether the discrimination is proposed in good faith, and the treatment of the class discriminated against.") (internal citations omitted). When considering discrimination between classes of claims and whether the treatment is unfairly discriminatory the classes of claims must be of the same priority *See In re Texas Star Refreshments, LLC,* 494 B.R. 684, 698 (Bankr. N.D.Tx.2013) (noting that "unfair discrimination works only among claimants of equal nonbankruptcy priority").

 The Rialto Plans provide that neither Lester nor Touchmark will have a deficiency claim after the sale of each of those creditor's collateral. In appropriate circumstances, such "dirt for debt" treatment can provide the indubitable equivalent of the creditor's claim. *See In re Riddle,* 444 B.R. 681, 685 (Bankr.N.D.Ga. 2011) (citing *Arnold & Baker Farms v. U.S. (In re Arnold & Baker Farms),* 85 F.3d 1415 (8th Cir.1996); *Sandy Ridge Development Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Development Corp.),* 881 F.2d 1346 (5th Cir.1989); *In re Atlanta Southern Business Park, Ltd.,* 173 B.R. 444 (Bankr.N.D.Ga.1994)). In order for treatment of a secured creditor's claim to qualify as being the "indubitable equivalent" of the claim, the treatment must be completely compensatory. *In re Riddle,* 444 B.R. at 685. In this regard, an equivalent is "indubitable" if no reasonable doubt

exists that the creditor will be paid in full. *Id.*

Here, Debtor estimates the value of the Lester property at $500,000 with a Petition Date debt of $55,223.60. [D. Ex. 10; Main Case, Doc. No. 393]. Given the estimated value of almost ten times the debt, no reasonable doubt exists that Lester will be paid in full from the sale whether by the Liquidating Agent or by foreclosure of the 2271 Cascade Road property. Similarly, with respect to the Touchmark deficiency claim, Debtor estimates the value of the 2781 E. College Avenue property at $850,000, with a Petition Date debt owed of $681,856.30. *Id.* While the amount of equity cushion for the Touchmark Property is significantly less than that of the Lester property, it is still in excess of $150,000 of the amount owed to Touchmark as of the Petition Date. Further, Touchmark has been receiving adequate protection payments during the pendency of this case such that the estimated claim amount as of April, 2014 is $667,000. Given the equity in the property and the improving real estate market in Atlanta, the Court finds that no reasonable doubt exists that Touchmark will be paid in full by receipt of the proceeds of the sale of the 2781 E. College property and the treatment proposed for the Lester and Touchmark claims does not discriminate unfairly in favor of the Allowed Rialto Deficiency Claim.

Midtown filed an objection to confirmation of Rialto's Plans, stating in the objection and at the Hearing, that the plan "attempts to force Midtown to affirmatively elect between two options for treatment both resulting in the sale or foreclosure of the [collateral] in full and final satisfaction of the" Midtown claim. [Main Case, Doc. No. 501]. Midtown argues that the plan is neither fair nor equitable, and was not proposed in good faith under § 1129(a)(3), as evidenced by the fact that Midtown would be forced to accept the sale or foreclosure of its collateral instead of being able to continue to receive payments.[18] Midtown holds a non-recourse claim against CPII, and is only entitled to the indubitable equivalent of its claim. Foreclosing on property subject to a non-recourse claim is necessarily completely compensatory and is thus the indubitable equivalent of Midtown's claim and Midtown's objection is overruled.

Debtors further object to the treatment of the secured claim of Farmers, arguing that the Plan discriminates unfairly against the claim because it does not provide for the sale of the property or foreclosure as is the case for other non-Rialto secured lenders. Debtors object that the terms of the Rialto Plans and budget projections conflict with respect to the treatment of Farmers' claim. The Disclosure Statement and Plan state that Farmers will be paid in accordance with the existing terms of its note at $812 per month for six months from the Effective Date, until the claim is paid in full however, there is no provision for sale of the property and the claim will not be paid in full in six months if paid in accordance with the note terms. Rialto's Liquidating Budget provides for sale of the property by month seven. [R. Ex. 50]. It would appear this is merely an oversight, and as with certain other objections, a matter that could be remedied in a confirmation order if the Rialto Plans were otherwise confirmable. This is not the

---

18. Midtown objected to the treatment of its potential deficiency claim with respect to pursuing non-debtor obligors. The second modification [Main Case, Doc. No. 787] provides for retention of a deficiency and rights to collect against non-debtors resolving this portion of Midtown's objection.

case however, and the Debtors' objection is sustained.

### b. Treatment of Management Fee Claims

Debtors also object that the general unsecured creditor classes are treated more favorably than the management fee class and since the management fee claims are of equal nonbankruptcy priority with general unsecured claims this amounts to unfairly discriminatory treatment. The Rialto Plans provide that the management fee claims of Cartel Properties, "shall be paid in full after payment of all Allowed Claims in 431 W. Ponce Tax Class, Rialto Secured 431 W. Ponce Class, 431 W. Ponce Unsecured Class and Rialto Deficiency 431 W. Ponce Class but only to the extent that 431 W. Ponce has any funds available for distribution. Pursuant to 1126 of the Bankruptcy Code, the Holder of an Allowed 431 W. Ponce Management Fee Class Claim is not entitled to vote to accept or reject this Plan and is deemed to have rejected the Plan." [19]

 The Rialto Plans provide for payment in full with interest on the Effective Date for unsecured creditors. The management fee claims are general unsecured claims held by affiliates and/or insiders of Debtors. There is no explanation for subordinating payment of the management fee claims to payment of other unsecured claims, so that one would suspect that the disparate treatment is the result of the Cartel Properties management fee claims being the claims of an affiliate/insider of the Debtors. In order to subordinate a claim there must be some showing of inequitable conduct. *See Estes v. N & D Properties,* 799 F.2d 726, 731 (11th Cir. 1986).

Although Rialto solicited testimony from Debtors' controller that there was no written management contract that he had seen, that the pre-petition management fee structure was the greater of 5% of gross revenue or 1% of asset value reflected on the balance sheet, and that pre-petition the fees were not always paid, there was no evidence of mismanagement or other inequitable conduct that could support subordinating the management fee claim. Indeed, the testimony from both Jackson and Rialto's expert, Mr. Greenspan ("Greenspan"), was that the Debtors books and records were well maintained, that transactions were segregated by entity and were, in Mr. Greenspan's words, "very clean." [Tr. 3/28; 5:31].

No basis other than insider status having been submitted, let alone established, at the Hearing the Court finds that the lesser treatment provided to the management fee claims is unfairly discriminatory and violates § 1129(b)(1). *See Olympia & York Florida Equity Corp v. Bank of New York (In re Holywell Corp.),* 913 F.2d 873, 880 (11th Cir.1990) ("the fact that [a] claim ... is in part an equity interest does not justify subordination"); *see also In re ARN Ltd. Limited Partnership,* 140 B.R. 5 (Bankr.D.C.1992); *but see Brinkley v. LeBlanc (In re LeBlanc),* 622 F.2d 872 (5th Cir.1980).

In addition to subordinating payment on pre-petition management fee claims, the Rialto Plans provide for rejection of the Cartel Properties' management agreement with Debtors' and bars a rejection claim. This disallowance is unexplained, and as with the treatment of the pre-petition claim, is without basis. As previously noted, the agreement terms are unknown and it is thus possible that there would be no rejection claim but this does not provide a

---

**19.** The Rialto Plans provide the same treatment for the management fee claims of Cartel Properties against each of the Debtors in each Debtor's Rialto Plan.

basis to impose an absolute bar on a possible claim. Such an absolute bar is impermissible and discriminates unfairly.

Debtors object further that the proposed treatment of management fee claims violates the absolute priority rule, which requires, with respect to a non-accepting impaired class of unsecured creditors, that no junior interest receive or retain property on account of their interest if senior claims aren't paid in full. 11 U.S.C. § 1129(b)(2)(B)(i), (ii). The Rialto Plans contemplate that the management fee classes will not receive any distribution as evidenced by the provisions of the Rialto Plans that the management fee claims are deemed to reject the plans under § 1126(g).[20] This is not consistent with Peskin's testimony in which he said that at some point he believed all claims would be paid and is also inconsistent with the liquidation analysis for the Debtors' assets which indicate that only in CPSW and 525 will the management fee claims be unpaid. Thus, Debtors are correct that at least some of the Rialto Plans violate the absolute priority rule. Rialto argues Debtors cannot raise this objection because they do not represent the equity interest holders. However, RI is an equity holder and further this Court has an independent duty to insure that the absolute priority rule is not violated, regardless of whether there is an objection. *In re Lett,* 632 F.3d 1216 (11th Cir.2011). Accordingly, Debtors objections regarding treatment of management fee claim in the Rialto Plans are sustained.

### c. Treatment of Insider Claims

Debtors argue that the treatment of the insider claims, other than management fee claims, violates the fair and equitable requirement of § 1129(b)(2)(B), because equity retains its interests while non-Rialto deficiency claims are not paid in full. With respect to the argument that the non-Rialto deficiency claims are not paid, as previously discussed, the non-Rialto deficiency claims receive full compensation and thus, the indubitable equivalent of their claims. [*See supra* pg. 682–83]. Accordingly, the treatment of deficiency claims does not run afoul of the absolute priority rule and the fair and equitable requirement.

■ Debtors argue further that the recharacterization of the insider claims as equity is a non-core matter for which this Court does not have constitutional authority to enter a final order. Even after *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), if the determination of the status of a claim is required for allowance or disallowance of that claim, then the bankruptcy court has constitutional authority and jurisdiction to make such a determination. *See In re DPH Holdings Corp.,* 448 Fed.Appx. 134, 135 (2nd Cir.2011) ("Core proceedings include those seeking the 'allowance or disallowance of claims against the estate,' 28 U.S.C. § 157(b)(2)(B), and, here, the resolution of whether [debtor's] estate is liable for those workers' claims will determine whether the claims asserted against the estate should be allowed or disallowed."); *see also Katchen v. Landy,* 382 U.S. 323, 329–330, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (stating that the power to allow or to disallow claims includes "full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based."). Here, whether the insider claims are debt or equity is integral to determin-

---

**20.** Section 1126(g) states as follows: "[n]otwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests."

ing the treatment to be accorded the insider claims and is a necessary first step to determine if allowance or disallowance is required, thus the Court has constitutional authority to consider recharacterization of claims.[21]

The evidence with respect to insider claims from Ms. Shakhnovsky was that the "loans" were not memorialized by notes but were entries in Debtors' ledgers reflecting advances, as receivables and payables, between the entities when necessitated by cash flow needs and as directed by Rohrig. Funds were advanced from both Rohrig and other entities. These "loans" did not have repayment terms, but there was a general understanding that when the entity had money available, the "lender" would be repaid. [Tr. 3/26; 5:05]. Rohrig testified that a commercial lender would not have made a loan to the debtors to fund these transactions, thus the evidence supports recharacterizing the insider loans. *See Estes*, 799 F.2d at 731 (stating "equitable subordination is proper where three elements are established: (1) that the claimant has engaged in inequitable conduct; (2) that the conduct has injured creditors or given unfair advantage to the claimant; and (3) that subordination of the claim is not inconsistent with the Bankruptcy Code."). Accordingly, Debt-

ors' objections regarding treatment of insider claims are overruled.

### d. Treatment of Unsecured Claims

Debtors argue further that the Rialto Plans violate § 1129(b)(2)(B)(i), because they only pay unsecured creditors 2.5% interest on their claims, which does not provide the holders of such claims the current value of their claim. Debtors are correct in that such rate seems arbitrary, and no evidence was presented to support that rate. *See* Daniel W. Sklar, Holly J. Killibarda, *"Legal Rate" of Post–Petition Interest for Unsecured Creditors in Chapter 11 Cases,"* 29–OCT Am. Bankr.Inst. J. 32 (2010) (discussing the use of the Federal Judgment Rate and contract rate under state law to calculate interest on unsecured claims). Because there was no evidence with respect to the proposed interest rate and the Debtors' objection is sustained. *See In re Westwood Plaza Apartments, Ltd.*, 192 B.R. 693, 696 (E.D.Tx.1996).

### e. Other Objections

Debtors raise several additional objections to the Rialto Plans all of which the Court finds are without merit and overrules the same. To the extent any objection or argument raised by Debtors is not specifically addressed herein, it is overruled.[22]

---

**21.** Debtors also object that the treatment of equity interest claims is contradictory in Rialto's Plans and Disclosure Statement. As discussed herein, the language of the Plans control and are clear that equity interest holders will retain their interests.

**22.** Debtors argue that the Rialto Plans must be construed against its drafter, because "all" of the creditors and other voting parties rejected the Plan. This argument is factually incorrect and not consistent with the Code such that it is overruled. Debtors argue that § 6.1 of the Rialto Plans violate § 549 of the Code, because it allows the Liquidating Agent to reverse prior payments via the claim objection process. However, if a plan with provi-

sions that allow for such post-petition transfers is approved, then § 549 is not violated. Debtors argue that Rialto's liquidation analysis for their plan is incongruous in that it shows 100% payout to all creditors under their plan with a liquidating agent, but a different result upon conversion to a chapter 7 case. The cost structure and monetary gain to the estate is far greater in a structured sale, as proposed through a plan, than through a chapter 7 Trustee in a fire sale and the differential is justified. Finally, Debtors argued in objection to Rialto's Plan that there was no guarantee it would take one year to effectuate, that it constituted a defacto receivership in violation of the Code, and that the plan disenfranchises other interested parties by shifting

### 1. Debtors' Plan

#### a. The Knuckle Partnership & Loudermilk Objections— § 1129(a)(1) & (2)

TKP argues that RI's assumption of the Operating Agreements violate § 1129(a)(1), because RI seeks to strip the transfer restrictions and dissociation provisions from the agreements which RI cannot do because a Debtor must assume an agreement in total or not at all. TPK argues that the Operating Agreements provide for loss of RI's management duties, but that RI will otherwise retain its economic interest in the non-debtor LLCs. Debtors do not dispute that the Operating Agreements are executory. [Main Case, Doc. 390, pg. 60–61]. As such, the question is whether § 365(e)(2) applies to prohibit assumption of the agreement where the nondebtor does not consent to assumption. TKP asserts that it does.

Debtors, at a prior hearing on TKP's motion for relief from stay took the position that applicable law in § 365(e)(2) is § 541(c)(1). This is clearly contrary to Eleventh Circuit authority. *See In re James Cable Partners, LP*, 27 F.3d 534, 538 (11th Cir.1994) (applicable referred to in § 365(c) is obviously non-bankruptcy law). The Courts that have considered this issue have generally agreed that dissociation provisions from state corporate law are enforceable pursuant to the exception contained in § 365(e)(2).[23] *See In re Warner*, 480 B.R. 641, 650 (Bankr.N.D.W.Va. 2012); *In re Soderstrom*, 484 B.R. 874, 880 (Bankr.M.D.Fl.2013); *In re H & W Food Mart, LLC*, 461 B.R. 904, 909 (Bankr. N.D.Ga.2011).

TKP argues further that the Debtors' Plan does not specifically address treatment of the dissociation provisions but that TKP believes Debtors will take the position that the RRDJV is the co-managing member of the LLCs. Because Georgia law and the Operating Agreements provide for dissociation and because the Operating Agreements are executory contracts, to the extent the Debtors' Plan seeks to continue Debtors' co-manager status it would violate § 1129(a)(1). Because the Debtors' Plan does not specifically address this point and because RI does not have the right to continue as co-manager, the Court will construe the Debtors' Plan to comply with the Code, that is, to enforce the dissociation provisions. TKP argues further that the proposed assumption by the RRDJV completely ignores the transfer restrictions in the Operating Agreements and thus runs afoul of § 362(e)(2). If the RRDJV vehicle were approved, this argument may have force, but it is moot because the Debtors' motion for substantive consolidation is denied and using the RRDJV to implement consolidation is unnecessary. [*See infra* pg. 40–44].

#### b. Rialto's objections to Debtors' Plan

In contrast to Debtors' objections to its Plans, Rialto has limited its objections to challenging the Debtors' satisfaction of § 1129(a)(7), (a)(10), (a)(11) and the fair and equitable requirements of § 1129(b). In addition to the objections under these sections, Rialto strenuously opposes Debtors proposed "deemed consolidation" and that Debtors have satisfied the requirements for substantive consolidation. State Bank also objects to the treatment proposed for its claim and argues that the Debtors' Plan is not fair and equitable. Initially, the Court will consider whether Debtors' Plan satisfies § 1129(a)(10), be-

---

the risk burden to creditors other than Rialto. The Court finds each of these objections to be without merit and overrules each of them.

**23.** The Court will enter a separate order on TKP's motion for relief from stay.

cause this determination affects the necessity for addressing each of the other confirmation requirements.

## 2. The Vote—§ 1129(a)(10)

Debtors assert, on a consolidated basis, that "all classes voted to accept Debtors' Plan except as follows: (a) Class 2 (Rialto) and Class 10 (State Bank) voted to reject Debtors' Plan and (b) Classes 5, 6, 16 and 19 did not vote or otherwise have voting claims. With 84 claims voting, Debtors received 81 acceptances and 3 rejections." [Main Case, Doc No. 694]. Debtors' Plan proposes that post-confirmation, the six Debtors will form the RRDJV, through a "deemed substantive consolidation." The RRDJV is a Georgia common law joint venture.

### a. Substantive Consolidation

The effect of this "deemed substantive consolidation" is as follows:

On and after the Effective Date, (a) all Assets of the Debtors shall be treated as though they were contributed (but not conveyed) for operational purposes to the RRDJV, such that all of the Debtors' Assets will be subject to the allowed Claims against all of the Reorganized Debtors; (b) Allowed Claims against each individual Debtor may be satisfied form the Assets of all of the Reorganized Debtors; (c) the RRDJV will service all Allowed Claims against any Debtor in the manner provided under this Plan and Claims arising out of or related to the operation of the RRDJV may be made against "431 W. Ponce de Leon, LLC, Cartel Properties Spalding Woods, LLC, 525 Moreland Avenue, LLC, Cartel Properties II, LLC, Rohrig Investments, LP, and Rohrig Pollack, LLC d/b/a The Rohrig Reorganized Debtor Joint Venture"; (d) for all purposes associated with Confirmation (including, without limitation, for purposes of tallying acceptances and rejections of

the Plan), distributions, and reporting under the Plan, the Estates of the Debtors shall be deemed to be one consolidated Estate in the RRDJV; (e) any guarantees of any individual Debtor of the obligations of any other Debtor(s) shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint and several liability of any Debtor shall be one obligation of the Reorganized Debtors; (f) the Intercompany Claims will be discharged; and (g) each and every Claim filed or to be filed in the Bankruptcy Cases shall be deemed filed against all of the Debtors, and shall be consolidated Claims against and consolidated obligations of the Reorganized Debtor.

The RRDJV, and the deemed substantive consolidated (sic) represented therein, shall not (other than for purposes related to funding distributions under the Plan and as otherwise set forth herein) affect a transfer or commingling of any assets of any of the Reorganized Debtors, and all assets of the respective Reorganized Debtors will continue to be owned by the respective Reorganized Debtors. Additionally, the deemed substantive consolidation shall not affect: (a) the legal and organizational structure of each Debtor; (b) any Pre and Postpetition guarantees, liens, and security interests that are required to be maintained (i) under the Bankruptcy Code, (ii) in connection with contracts or leases that were entered into during the Bankruptcy Cases or executory contracts of unexpired leases that have been or will be assumed, or (iii) pursuant to this Plan; (c) distributions from any insurance policies or proceeds of such policies; (d) the filing of tax returns by each Reorganized Debtor; (e) any obligations under any leases or contracts assumed

in the Plan or otherwise after the Petition Date; and (f) the ownership of Equity Interests in the Reorganized Debtors.

[Main Case, Doc. 390, pgs. 30–31]. At the Confirmation Hearing, and in their respective Objections, Rialto, State Bank and TKP object to the formation of the RRDJV, alleging that it results in the improper gerrymandering of classes and votes, and further that it does not comply with Eleventh Circuit precedent regarding substantive consolidation. Debtors argue to the contrary that, the Court need not consider the requirements of *Eastgroup Properties v. S. Motel Ass'n, Ltd. (In re Eastgroup)*, 935 F.2d 245 (11th Cir.1991), because creditors will be paid 100% so that there is no detrimental effect to any creditors because of the deemed consolidation and *Eastgroup* does not apply.

The Court disagrees. One of the effects of the proposed consolidation is that all creditors are effectively cross collateralized because all assets stand for all debts. Peskin testified that Rialto bargained for and obtained the cross collateralization provisions in the Forbearance Agreement and that those additional protections were material to Rialto. The effect of pooling assets and liabilities is that all of Debtors' creditors get the protection Rialto specifically bargained for which negatively impacts Rialto. Another effect of the proposed consolidation is that creditors of solvent debtors, for instance, State Bank has its claim diluted by creditors of the insolvent debtors, 525 and CPSW. Thus, the Court does not agree that there is no negative impact on creditors resulting from the deemed consolidation.

The Court also disagrees with Debtors' argument that *Eastgroup* does not apply because substantive consolidation "involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation" as well as elimination of inter-company debt and combining votes for purposes of a plan. *Eastgroup*, 935 F.2d at 248 (11th Cir.1991). This is exactly what the Debtors propose. Consequently, Debtors must satisfy the factors identified in *Eastgroup*.

In *Eastgroup*, the Eleventh Circuit set forth the standard that bankruptcy courts should use to determine whether cases should be substantively consolidated. The Court first recognized that the purpose of substantive consolidation is "to insure the equitable treatment of all creditors" and "almost invariably redistributes wealth among the creditors of the various entities", so "that substantive consolidation should be used sparingly."[24] *Eastgroup*, 935 F.2d at 249 (11th Cir.1991). The Court held that the proponent of consolidation "must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *Id.* If this showing is made then "a presumption arises 'that creditors have not relied solely on the credit of one of the entities involved ... and the burden shifts to the objecting creditor to show that (1) it has relied on the separate credit of one the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." *Id.* The Court then identified the following factors that the proponent of consolidation may want to use address substantial identity: (i) the presence

---

24. At the same time the Eleventh Circuit recognized "a 'modern' or 'liberal' trend toward allowing substantive consolidation.'" *Id.* at 248. Arguably, in the twenty plus years since the *Eastgroup* opinion the trend is tilting away from allowing consolidation. *See, e.g., In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).

or absence of consolidated financial statements; (ii) the unity of interests and ownership between various corporate entities; (iii) the existence of parent and intercorporate guarantees on loans; (iv) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (v) the existence of transfers of assets without formal observance of corporate formalities (vi) the commingling of assets and business functions; and, (vii) the profitability of consolidation at a single physical location. *Id.* at 251. The Court said further, that, "[w]e stress, however that we mention specific factors ... only as examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or realize some benefit." *Eastgroup*, 935 F.2d at 250 (11th Cir.1991).

■ With respect to the seven factors, the Court finds that the only element that is arguably satisfied is that of unity of interest and ownership between the corporate entities all relate to Rohrig. All of the evidence from Debtors' management company, Debtors' experts and Rialto's expert was that the Debtors keep their books and records separate and account for any intercompany transactions such that there would be no difficulty segregating and ascertaining individual assets and liabilities. Debtors did not provide consolidated financial statements. There was no evidence presented that the Debtors provided intercompany guarantees. Rohrig guaranteed certain obligations, but there is no evidence that the Debtors did. Indeed, the Debtors did not guarantee each other's obligations to Rialto.

With respect to the benefits of consolidation, Debtors identified the ease of administration and the ability to pay all creditors in full because consolidation allows for insolvent debtor's creditors to be paid by solvent debtors, and although not highlighted, the effect on voting requirements. The major harm the Court sees is identified above with respect to eliminating Rialto's bargained for protection of cross collateralization and dilution of other assets available to satisfy creditors of the solvent Debtors. The Court does not believe the harm caused by substantive consolidation is outweighed by the benefits. Accordingly, the Court denies the Motion for Deemed Substantive Consolidation embodied in the Debtors' Plan. [Main Case, Doc. No. 393, pg. 30]. This does not end the Court's inquiry because, Debtors, "reserve[d] the right to request confirmation and consummation of a plan without consolidation" so the Court will consider whether the Debtors' Plan meets the requirements of § 1129(a) without consolidation. [Main Case, Doc. No. 390, pg. 31].

### b. Tax Claims Held By Third Parties

One result of the disapproval of Debtors proposed "deemed consolidation" is that each Debtor will have to satisfy § 1129(a)(10). Debtors argue that each Debtor has obtained the vote of an accepting impaired class. In four of the Debtor's cases, 525, RI, CPII and RP, this class is comprised of claim(s) held by transferees of tax fi.fas. The Debtors have classified these secured claims in class 1. [Main Case, Doc. No. 393, pg. 32, 42]. Debtors classify class 1 as impaired and provide for payment to class 1 in accordance with § 1129(a)(9)(C) as required by § 1129(a)(9)(D) for secured tax claims.

Rialto argues that Debtors treatment of ad valorem tax claims, in accordance with the treatment proscribed by § 1129(a)(9)(C), means that these claims are not impaired and an affirmative vote by class 1 (against the four Debtor's that have such obligations) does not satisfy § 1129(a)(10). [Main Case, Doc. No. 719,

pg. 2]. Debtors do not disagree with the proposition cited by Rialto, that tax claims treated in accordance with § 1129(a)(9)(C) and (D) are not impaired, but argues that since the tax claims are held by third-parties and not by governmental entities these claims are impaired. Rialto argues that the use of the word "holder" in § 1129(a)(9)(D) should be interpreted broadly and applied to any third-party holder of a tax claim.

Interpretation of § 1129(a)(9)(D) begins with the language of the statute. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Section 1129(a)(9)(D) states:

> with respect to a secured claim which would otherwise meet the description of the unsecured claim of a governmental unit under § 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9)(D). The statute requires that the claim be secured and then that it "would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) ..." 11 U.S.C. § 1129(a)(9)(D). Section 507(a)(8) states in relevant part: "... allowed unsecured claims of governmental units, only to the extent that such claims are for—(A) a tax ... (B) a property tax incurred before the commencement of the case and last payable without penalty after one year before the date of the filing of the petition...." 11 U.S.C. § 507(a)(8). Section 507(a)(8) clearly describes various tax claims of governmental units. It is undis-puted that the class 1 claimants are not governmental units,[25] that the debts are on account of ad valorem property taxes and that the claims are secured. The disputed issue is the affect of the word holder in § 1129(a)(9)(D) and whether the treatment proscribed in § 1129(a)(9)(D) is limited to a governmental unit that is the holder of the tax debt.

Neither Debtors nor Rialto cite any authority with respect to this issue and the Court's research has not identified any case on point. There is authority that addresses the meaning of "tax claim" as used in § 511, which like § 1129(a)(9)(D) was added to the Code in 2005. In those cases, the issue is whether the term "tax claim" is broad enough to encompass third party claims such as is at issue here. The courts that have addressed this issue have generally held that because the term "creditor" rather than the term governmental unit is used in § 511, the term tax claim is broader than the claims described in § 507(a)(8) and third parties are entitled to receive interest as provided in § 511. In reaching this conclusion several courts have noted that Congress specifically limited the applicability of section § 507(a)(8) and § 1129(a)(9)(C) and (D) to governmental units but did not so limit the application of § 511. *In re Davis*, 352 B.R. 651 (Bankr.N.D.Tex.2006); *Tax Ease Funding, L.P. v. Thompson*, 626 F.3d 239 (5th Cir.2010) (citing *Davis*); *In re Cortner*, 400 B.R. 608 (Bankr.S.D.Ohio 2009) (citing *Davis*); *see also In re Thomas*, 2001 WL 55533 (Bankr.W.D.Pa.2001), *vacated in part by National Tax Funding v. Thomas*, 2002 WL 32093127 (W.D.Pa.2002).

**25.** Governmental Unit is defined as the "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." § 11 USC 101(27).

Section 1129(a)(9)(D) makes one exception to the claim described in section § 507(a)(8) in defining the claims to which § 1129(a)(9)(D) applies and that is "but for the unsecured nature of the claim." 11 U.S.C. § 1129(a)(9)(D) The section does not alter the requirement that the claim be that of a governmental unit. The Court finds further support for the proposition that the claim identified by § 1129(a)(9)(D) must be held by a governmental unit in the fact that Congress did not use the term "creditor" in § 1129(a)(9)(D) as it did in § 511, rather § 1129(a)(9)(D) references § 507(a)(8) which clearly refers to a governmental entity. Thus, the Court holds that the class 1 claimants, which are not governmental units, are entitled to be treated in accordance with their underlying state law rights and to the extent the Debtors' Plan impairs those rights and class 1 claims are impaired.

O.C.G.A. § 48–4–40(1) provides that a delinquent tax payer has an initial period of 12 months from the date of the tax sale in which to redeem the property. O.C.G.A. § 48–4–40(1); *Saffo et al. v. Foxworthy, Inc.*, 286 Ga. 284, 286, 687 S.E.2d 463 (2009). At the expiration of the 12–month period, the new owner has the ability to terminate and forever bar the right of redemption by setting a bar date and providing notice as required by O.C.G.A. § 48–4–46. Subject to only clear evidence that the taxes were not due or the notice was defective, once the notice of foreclosure of the right of redemption is served, the property may be redeemed only by payment of the full redemption amount which includes the tax, plus statutory penalties. Further, O.C.G.A. § 48–3–19(e)(1) provides that, "[w]henever an execution has been transferred to any transferee, the transferee shall not be authorized to submit the execution to the appropriate levying officer until 12 months after the date of

such transfer or 24 months after the tax giving rise to the execution was originally due, whichever is earlier." The Debtors' Plan provides for payment over 48 months, such that the timeframe for payment is extended and the ability to foreclose unless the statutory amounts are paid is not preserved. Thus, Debtors' treatment impairs the rights of class 1 creditors; class 1 is impaired and claimants are entitled to vote.

With respect to 431 and CPSW, both Debtors received acceptances from their respective class of unsecured creditors. Rialto argues that Debtors have not proposed to pay unsecured creditors interest in an effort to gerrymander the vote. Although the amount necessary to pay interest to the unsecured class is de minimis, the Court finds that the proposed treatment, payment without interest of unsecured claims, is not indicative of bad faith and Rialto's objection regarding gerrymandering is overruled. *See, e.g., Western Real Estate Equities, LLC v. Village at Camp Bowie I, L.P. (In re Village At Camp Bowie I, L.P.)*, 710 F.3d 239 (5th Cir.2013) (plan proponent's motives and methods for achieving compliance with § 1129(a)(10) must be scrutinized, if at all, under § 1129(a)(3)) (citing *In re Sandy Ridge*, 881 F.2d 1346 (5th Cir.1989)); *see also In re Park Forest Development Corp.*, 197 B.R. 388, 396 (Bankr.N.D.Ga.1996) (finding that artificial impairment of claims was not a sufficient bad faith basis to deny confirmation of a plan or dismiss the case) (citing *In re Atlanta–Stewart Partners*, 193 B.R. 79 (Bankr.N.D.Ga.1996) (Kahn, J.)).

Rialto raised several other objections to the Report of Balloting that are either moot or unnecessary to the Court's determination whether each Debtor satisfied

§ 1129(a)(10).[26] To the extent the Court has not specifically addressed an objection raised by Rialto and TPK[27] in its Objection to Report of Balloting, the same is overruled. Debtors have reserved the right to seek confirmation without consolidation, thus the Court will now consider whether the Debtors have satisfied the remaining requirements of § 1129 on a debtor by debtor basis.

### 3. Best Interests Test of § 1129(a)(7)

Rialto argues that because RI rejected the offer by TKP to purchase RI's interest in the TKP LLCs that the Plan is not in the best interests of creditors because there is not $10 million in hand to pay creditors. The Court notes that there was a dearth of evidence to support the ability to pay this amount and the timing for such payment. More importantly, even if it is assumed that TKP has the ability to pay $10 million in short order, this is not the standard for determining if the Debtor meets the best interest of creditors' test, rather § 1129(a)(7)(A)(ii) only requires that "a dissenting creditor [receive] at least as much value as the dissenting creditor would receive under a Chapter 7 liquidation." *See Mercury Capital Corp. v. Milford Connecticut Assoc., LP*, 354 B.R.

1, 8 (D.Conn.2006) (quoting *US v. Reorganized C & I Fabricators, Inc.*, 518 U.S. 213, 228, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996)); *see also In re J.C. Householder Land Trust # 1*, 501 B.R. 441, 456 (Bankr. M.D.Fl.2013).[28] Debtors propose to pay its dissenting creditors, Rialto and State Bank, in full with interest, albeit with balloon payments in year 10. Debtors propose to include TKP in class 20. [Main Case, Doc. No. 725].

As previously discussed with respect to the Rialto Plans, in a chapter 7 case, CPSW's assets would not be sufficient to pay Rialto's deficiency claim against CPSW. [*See supra* pg. 31]. Thus, to the extent Debtor proposes to pay claims in full the best interests test is satisfied with respect to CPSW because in a chapter 7 case Rialto's claim against CPSW may not be fully paid. *Id.* With respect to 431 and CPII Rialto's collateral, based upon stipulated values for the properties, would allow for full payment of Rialto's direct claim in a chapter 7 case, but this is not more than is proposed in Debtors' Plan so that the best interests test is met in the 431 and CPII cases.[29] In the case of 525, the real estate is valued at less than the direct debt

---

26. TKP argues that it has been improperly classified as an insider and included in class 20 of Debtors' Plan. [Main Case Doc. No. 725]. The Court disagrees because TKP is an insider. RI has a 50% investment in the TKP LLCs. Thus, the TKP LLCs are an affiliate of Debtor, RI, because pursuant to § 101(2)(B), it is a "corporation 20 percent or more of whose outstanding voting securities are directly ... owned, controlled, or held with power to vote by the debtor." Further, the TKP LLCs are insiders of the Debtor because, pursuant to § 101(31)(E), the "term 'insider' includes ... (E) affiliate, or insider of an affiliate as if such affiliate were the debtor." TKP would be an insider of the TKP LLCs if they were the debtor, and because TKP would be an insider of the TKP LLCs, TKP is also an insider of the Debtor, RI, under § 101(31)(E).

27. TKP adopted the objections to balloting and voting raised by Rialto and the conclusions with respect to Rialto apply equally to TKPG. [Main Case, Doc. No. 725, ¶ 6].

28. To the extent Rialto argues that the failure to sell property evidences bad faith, the Court disagrees and overrules that objection.

29. Section 1129(a)(7)(A)(i) provides that it is satisfied if the creditor "has accepted the plan; or will receive ... property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive ... if the debtor were liquidated under chapter 7." § 1129(a)(7)(A)(i) and (ii). Because unsecured creditors accepted Debtors' Plan § 1129(a)(7) is satisfied with respect to them.

owed to Rialto and the Debtors' Plan satisfies the best interests test with respect to 525. Finally, with respect to RI, State Bank holds a second position lien against 246 W. Ponce De Leon Ave. In a chapter 7, because Rialto's entire claim is secured by RI's real estate, it is likely that State Bank would not be paid in full and the best interest test is met with respect to RI. Thus, Debtors' Plan satisfies § 1129(a)(7).

### 4. Feasibility of § 1129(a)(11)

As previously discussed, feasibility under § 1129(a)(11) requires that there be a reasonable probability of success, rather than a mere possibility under a proposed plan. [*See supra* pg. 23 (citing, *In re Diplomat Constr.,* 2009 WL 6498180 *2 (Bankr.N.D.Ga.2009)) ]. Courts consider the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation to determine feasibility of the plan. *Id.*

In formulating her opinion on feasibility, Jackson relied on her review of filed documents, including the cash collateral budgets, Monthly Operating Reports ("MORs"), Statement of Financial Affairs ("SOFAs"), and interviews with Debtors' personnel, George, Matt and Al Rohrig, Stephen DeWitt, Ella Shakhnovsky and Nan Dowdle. Jackson did not prepare any independent valuations and relied upon the stipulated values for Debtors' properties. Jackson prepared a Sources and Uses analysis for Debtors' cash flow, projecting net operating cash flow, funds available for capital expenditures and leasing costs, and plan payments. [D. Ex. 3]. In so doing, she relied solely on Debtors' post petition performance because she believes the data prior to February 2013 is skewed by the "Great Recession." The projections assume that the use of Debtors' real property does not change and, to the extent these uses are interim, Jackson testified the projections are conservative. In addition, the projections include a 3% year over year increase in rent revenue.

Rialto challenges several of Jackson's assumptions, including the projected 3% year over year increase in rental rates. The question is whether these assumptions are sufficiently reasonable and reliable to result in a successful reorganization. *American Trailer,* 419 B.R. at 424 (Bankr. W.D.Mo.2009).

Jackson testified that the Debtors projections were based on her more than 20 years of experience in the Atlanta real estate market, her observations that vacancy rates for office, industrial and retail spaces are rebounding from the low reached in 2008–2009, the actual occupancy rates of each individual property and interviews with Matt Rohrig. According to Jackson, these interviews indicated that, in general, escalations of 3–5% per year were included in Debtors' leases and were part of Debtors' business model. On that basis she concluded that a 3% increase is a reasonable projection for increased revenue from rent escalations on a contractual basis or inflationary increase with new leases projected to be 3–5% above current levels based on historically stated rates. [Tr. 4/24; 11:28]. Jackson opined further that over 10 years the rental rates will vary but 3% on average is supportable when one considers that inflation has averaged 3.3% over the last 100 years.

Mr. DeWitt, Debtors' controller, also testified that most of the Debtors leases have a 3% rent escalation provision. Given the depressed real estate markets during the Great Recession, the testimony from all parties that the real estate market is improving, that Debtors historically have obtained this range of rental increase and the testimony that 3.3% is the 100

year average inflation rate, the Court finds that a 3% year over year increase is not unreasonable.

In addition, a review of Exhibit D to the Debtors' disclosure statement which sets forth all of Jackson's assumptions, reveals that Jackson also assumed that expenses would increase by 3% per year. [Main Case, Doc. No. 390]. Thus, effectively, the rental rate increase is a wash and indicates that if Debtors have been cash flowing on a current basis then they should, under Jackson's projections, continue to cash flow. As shown in the Debtors' Monthly Operating Reports, on an aggregate basis, Debtors have been cash flowing. [Main Case, Doc. No. 423–428].

Rialto argues that the projections are flawed because the sources of funds include sales proceeds from the sale of the Moreland Assemblage in year 1 in the amount of $2,517,500. The evidence at the Hearing established that Debtors have amended the sales contract [30] providing for a small portion of the earnest money provided to become non-refundable after the inspection period expires. The sale of the Moreland Assemblage has always been a bit speculative and Rialto has been consistent in its objections to the sale. Notwithstanding Rialto's objections the Court approved the sale and believes based on the evidence at the sale hearings and the Hearing that the sale has a reasonable probability of closing and does not find that inclusion in the projections of the sales proceeds from the Moreland Assemblage sale is fatal to Jackson's feasibility analysis.

Rialto argues further that the Debtors failure to require a reserve for capital expenditures and leasing costs precludes a finding that the Debtors' Plan is feasible.

The Sources and Uses analysis includes a line item for "Cash Available for Capital Expenditures & Leasing Costs." In year 1, cash available for capital expenditures and leasing costs is $281,788 which includes the sales proceeds from the closing of the sale of the Moreland Assemblage. The cash available for capital expenditures and leasing costs increases gradually year over year until year 10 when the cash available for capital expenditures and leasing costs is $737,229. Over the ten years of the Debtors' Plan, the total available for capital expenditures and leasing included in Jackson's projections is $5,023,045.

Jackson testified that capital expenditures and leasing costs would be paid from the net operating income prior to any distribution to classes 20 and 21 thus Debtors' experts characterized these classes as "good news classes." Jackson indicated that $5.0 million was more than sufficient to pay capital expenditures and leasing costs over the 10 years of Debtors' Plan and that she estimated the costs would be in the range of $1 million to $3 million. DeWitt testified that capital expenditures and leasing costs, including tenant improvements were historically 7% of revenue or approximately $140,000 per year or $1,400,000 over the life of the plan. In each year of the projections there is sufficient net operating cash to fund expenditures in this amount. However, that is not how the Debtors' Plan is written, nor is that how Jackson testified it was envisioned to work. Instead, Jackson testified that capital expenditures and leasing costs are anticipated to be paid after the $500,000 reserve (which would not be fully funded until year 2) is funded and before payments to insiders and equity.

---

**30.** The amendment was not approved by the Court and in fact, Debtors have not filed a motion to amend the sales contact.

The Plan provides for payment of the following amounts to the insider and affiliate class, class 20, and equity, class 21: equity, is "limited to receiving, at the end of the fiscal year, after all other payments provided for by this Plan for such year have been made, the greater of (i) the annual Income Tax Distribution and (ii) no more than 20% of the profits from the RRDJV for such year ..." [Main Case, Doc. No. 390, pg. 29]. The Income Tax Distribution is defined as "the distribution from the Reorganized Debtor to the Equity Interest Holders to meet annual income tax obligations, which shall be made annually in an amount equal to the lesser of the income tax liability due on account of income reported on the Schedule K1's issued by the Reorganized Debtors, and (ii) The Equity Interest Holders' actual liability for federal, state and local income taxed for the subject calendar year." [Main Case, Doc. No. 390, pg. 59]. Class 20, the insider and affiliate class is entitled to receive the "Profit Participation" which "means 80% of the Excess Cash Reserves of the RRDJV on a consolidated basis, if the Bankruptcy Court approves the Deemed Substantive Consolidation of the Bankruptcy Cases, or 80% of the aggregate Excess Cash Reserves of each Reorganized Debtor primarily obligated on the allowed Claim subject to the Profit Participation." *Id.*, pg. 61. Thus, Rialto argues that insiders and equity are entitled to all funds available after the $500,000 cash reserve because class 20 is entitled to 80% of amounts over $500,000 and class 21 is entitled to up to 20% of the same.

It is true that the terms of the Debtors' Plan do not require a reserve for capital expenditures and leasing costs such that payments to class 20 and 21 could be made without any capital expenditures or leasing costs being paid and such payments would not violate the terms of the Debtors' Plan. Because the evidence supports that fact that there is sufficient revenue to pay these costs, if a reserve for capital expenditures and leasing costs were the only issue standing in the way of confirmation it could be easily remedied by language in the confirmation order requiring that such payments be made or reserves funded prior to any distribution to classes 20 and 21. This is not the case though, as this issue is but one of several that has drawn objection from Debtors' creditors.

In addition to the reserve issue, there is substantial question regarding Debtors' ability to fund the balloon payments required by Debtors' Plan. "Confirmation of a plan is suspect, however, unless some proof is offered to show that the funds will be available at the time the balloon payment is due." *American Trailer,* 419 B.R. at 430 (Bankr.W.D.Mo.2009) (citing *First National Bank of Boston v. Fantasia (In re Fantasia),* 211 B.R. 420, 423 (1st Cir. BAP 1997)). "If a final payment, in the form of a 'balloon' payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." *In re Seasons Partners, LLC,* 439 B.R. 505, 515 (Bankr.D.Az.2010).

Jackson opined[31] that Debtors would be able to obtain refinancing at the end of

---

**31.** Rialto opposed Jackson's qualification as an expert with respect to underwriting and sought to disallow her testimony regarding the balloon payments. The Court overruled the objection because Jackson has underwriting experience, albeit not as a lender with respect to commercial properties, because her experience and knowledge is useful to the

year 10 to pay the $11.1 million in balloon payments due under Debtors' Plan. Jackson based this opinion on a calculation of debt service coverage ratio, that is, debt divided by net operating cash flow to reach a coverage ratio of 1.25 [32] which she opined would allow Debtors to obtain a loan at an interest rate of up to 11.5%. With respect to the interest rate anticipated at the end of year 10, Jackson did not analyze what the range of rates may be in year 10, rather she analyzed the Debtors' tolerance to rates, that is, what is the highest rate the Debtors could afford. Jackson did not determine a loan to value ratio even though she admitted, on cross examination that lenders generally loan to the lower of loan to value or debt service coverage ratio. She argued that the loan would be based on income produced not on a loan to value analysis.

▇▇▇ The Court concludes that the uncertainty regarding the debt service coverage ratio and the lack of information regarding the projected interest rates for refinancing causes the analysis of the ability to refinance to be too speculative to support Jackson's opinion regarding the Debtors ability to refinance in year 10. Further, and even more important, Jackson did not analyze each Debtor's ability to fund its own Plan payments or its ability to obtain a loan to make its individual balloon payment. The Court has held that the Debtors cannot consolidate as proposed in their Plan so the only way the Debtors can confirm plans is on an individual Debtor basis. Jackson admits that certain of the Debtors don't cash flow and certain of the Debtors do, however, there is no debtor by debtor analysis of feasibility, and the Debtors have not satisfied § 1129(a)(11).

### 5. Compliance with the Code—§ 1129(a)(1)

Rialto objects to the injunction that provides that all collection action against Rohrig is prohibited. [Main Case, Doc. No. 741, § 8.7]. Rohrig guaranteed many of the Debtors' loans. Rialto argues that the injunction is an impermissible bar to state law collection rights that creditors, including Rialto, bargained for, without any demonstration that the injunction is necessary and fair and it violates 11 U.S.C. § 524(e). There was no evidence at the Hearing of the need for such an injunction. In fact, Rohrig testified that he would proceed with the Debtors' Plan without an injunction enjoining collection actions against

court's understanding and further, because the court can adjust the weight given to her opinion. [Tr. 3/27; 11:30].

32. This may be understated because no adjustment to the stipulated values for the properties was made even though all the experts agree that the real estate market is improving. However, the amount that Debtors will be seeking to refinance is also understated because Rialto has incurred approximately $1.5 million in attorney's fees, costs and, asserts the right to collect default interest such that the increase may end up being a wash. With respect to the § 506(b) claim, the Court advised the parties that it would, for purposes of confirmation, estimate Rialto's 506(b) claim. *See In re MacDonald,* 128 B.R. 161 (Bankr. W.D.Tex.1991). But because neither Plan is confirmable it is not necessary to estimate Rialto's § 506(b) claim at this time. The parties have filed their applications and a hearing is scheduled for later this month to determine the current claim amount. Further, given the Eleventh Circuit's determination in *Welzel v. Advocate Realty Investments (In re Welzel),* 275 F.3d 1308 (11th Cir.2001), that § 506 is not used to disallow claims but is used to determine the value of the secured portion of the claim based upon the reasonableness of the amounts incurred, and Debtors' proposal to pay claims in full, for the purpose of establishing feasibility, all that is relevant is the amount of Rialto's additional claims not whether the amounts are reasonable and, are thus, unsecured.

him personally. Accordingly, this objection is sustained. [Tr. 3/31; 3:17].

Because Debtors have not established the § 1129(a) factors except for § 1129(a)(8), it is not strictly necessary for the Court to address the fair and equitable standard of § 1129(b). But, because neither Debtors' nor Rialto's plans as currently proposed are confirmable, in an effort to advance the reorganization process, the Court will address the fair and equitable argument raised by State Bank and Rialto.

### 6. Fair and Equitable

State Bank argues that the long repayment term, its second position lien status, the small reduction in principal over 10 years and Debtors' failure to take advantage of a favorable real estate market is unreasonable and shifts the primary risk of reorganization to it. [Main Case, Doc. No. 740]. Rialto too, argues that the long pay out and small pay down is not fair and equitable especially when considered in conjunction with the fact that classes 20 and 21 could be paid between $2 million and $3.5 million even if the Debtors paid for capital expenditures and leasing costs at the historical rate.

Section 1129(b) provides the minimum requirements for confirmation and "the Court may decide that a plan is not fair and equitable and is therefore unconfirmable even if it is in technical compliance with these requirements." *In re IPC Atlanta Ltd. Partnership*, 142 B.R. 547, 554–555 (Bankr.N.D.Ga.1992) (Drake, J.). Thus, before considering whether the proposed treatment satisfies § 1129(b)(2)(A)(i)(I), (II), (ii) and (iii), the Court will consider whether the treatment proposed is fair and equitable.

The eight promissory notes made by RI in favor of Rialto were largely short term interest only notes payable in one and two years. There are two RI notes that were

payable over a longer term, one was due in five years, the first two years were interest only with principal and interest payments for three years based on a 20 year amortization. The Note secured by the property at 246 W. Ponce De Leon, was due in 10 years based on a 20 year amortization for five years and a 15 year amortization for five years. RI's obligation to State Bank, which is also secured by the 246 W. Ponce De Leon property, was a five year interest only note due on October 21, 2016.

Similarly, CPII's notes are short term with one note being one year, interest only with a balloon and the other being two years of interest and 17 months of principal and interest on a 25 year amortization. The CPSW note was one year with a balloon and 431's note was for principal and interest payments amortized over 20 years payable in 10. Each of these obligations is proposed to be paid over ten years with a balloon at the end of year 10. Importantly, the payments proposed under the Debtors' Plan would reduce the indebtedness to Rialto and State Bank by approximately 18% over ten years. As was noted with respect to the feasibility of Debtors' Plan it is likely that the amount of pay down to Rialto is overstated because of Rialto's potential § 506(b) claim.

Judge Drake considered a similar risk shifting argument in *IPC Atlanta Ltd. Partnership*, 142 B.R. at 555–556. In *IPC*, lender argued, as do the objecting creditors here, that the plan proposed by Debtor shifted substantially all the risk of nonperformance to the lender because the plan did not provide for payment of principal before the original maturity of the loan and provided for insufficient capitalization by the partners causing inadequate reserves for repairs and replacements for the property making default more likely. Judge Drake found in *IPC* that, based on

the evidence regarding repairs necessary to the property, a $70,000 capital infusion by the partners and plan terms that allowed deferred maintenance to be completed that the lender was sufficiently protected. *IPC,* 142 B.R. at 555–556

■ In contrast, here, there is no capital infusion proposed by equity, there is no reserve for capital expenditures and leasing costs rather the plan provides for payments to insiders, affiliates and equity while paying less than 20% of the debt to the objecting creditors. To pay short term obligations over ten years with a pay down over that period of 18% or less[33] while only reserving $500,000 and potentially paying up to $4.5 million to insiders and equity is not fair and equitable.

Debtors and Rialto spent a great deal of time presenting expert testimony seeking to establish the appropriate interest rate under § 1129(b)(2)(A)(II), however, because such a rate cannot be determined without consideration of the specific repayment terms and the repayment terms currently proposed in Debtors' Plan cannot be confirmed, the Court will not address the appropriate interest rate.

## IV. Conclusion

The Rialto Plans fail to satisfy the fair and equitable requirement of § 1129(b) because of the unjustified subordination of management fee claims and further the evidence at the Hearing failed to establish that the Rialto Plans are feasible. Debtors' Plan can only be confirmed on a debtor by debtor basis and, on that basis, fails to satisfy the best interests test and feasibility as required by § 1129. Further the Debtors' Plan whether consolidated or not,

also fails to satisfy the fair and equitable requirement of § 1129(b).

In the interest of facilitating a productive discussion at the hearing scheduled below, the Court notes, that in some instances the interest provided pursuant to § 1129(b)(2)(A)(II) is sufficient to protect creditors' interests from the risk of reorganization. *See, e.g., IPC,* 142 B.R. at 555–556. Unfortunately this is not the case here, where the combination of the long repayment term, the minimal repayment over the plan term and the treatment of insiders and equity cause the Debtors' Plan to be unfair, inequitable and places too much of the risk of reorganization on creditors. Given the choice of two or more confirmable plans, courts prefer reorganizing plans to liquidating plans, but again, unfortunately this is not possible here. *In re Oaks Partners, Ltd.,* 141 B.R. 453, 456 (Bankr.N.D.Ga.1992) (citing *In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr.S.D.Cal. 1982); *In re Consolidated Operating Partners, L.P.,* 91 B.R. 113, 115–16 (Bankr. D.Colo.1988)).

The Court is keenly aware that this case has now been pending for 18 months and that the parties have spent vast amounts of time, effort and money to propose and litigate confirmation of plans that fail to treat each other fairly and equitably. The Court thus finds it is appropriate, in order to determine appropriate next steps in these cases, to hold a hearing on **August 19, 2014, in Courtroom 1402, 75 Spring Street, S.W., Atlanta, Georgia 30303, at 10:00 a.m.** to consider whether a chapter 11 Trustee should be appointed, as urged by TKP, whether some or all of the cases should be dismissed or converted, or if the

33. Given the substantial fees and costs incurred by Rialto, it is likely that the actual pay down will be less than 18%.

parties should have the opportunity to amend their respective plans.

**IT IS ORDERED.**